No. 33,072

E. J. Stockham, *Appellee,* v. Dr. J. C. Hall, *Appellant.*

(65 P. 2d 348)

Opinion filed March 6, 1937.

*Ralph T. O'Neil, John D. M. Hamilton, Barton E. Griffith,* all of Topeka, *L. H. Ruppenthal, James A. Cassler,* both of McPherson, and *J. N. Tincher,* of Hutchinson, for the appellant.

*Eustace Smith* and *Harry H. Dunn,* both of Hutchinson, for the appellee.

The opinion of the court was delivered by

Dawson, C. J.: This was an action for damages against a physician for malpractice predicated on alleged negligent treatment of an injury to plaintiff's ankle.

Plaintiff is a farmer residing about four miles from McPherson. Defendant is a physician and surgeon of long experience, who resides in McPherson and who had been the physician of plaintiff's family for many years.

In the late afternoon of May 11, 1934, while trimming a horse's hoofs in his barnyard, the beast trampled on plaintiff's right ankle, causing serious injury thereto. In the record the injury was variously called a "trimalleolar" fracture of the ankle, or a "bimalleolar and posterior marginal fracture," but which for purposes of this

review will be sufficiently designated as a "Pott's fracture," which Webster's International Dictionary says is "a fracture of the lower part of the fibula accompanied by injury to the ankle joint so that the foot is dislocated outward."

Plaintiff's son and daughter-in-law got him into some sort of vehicle and hauled him to the house and laid him on the floor. The doctor was called and arrived within half an hour. He gave the plaintiff a general anaesthetic, discovered a dislocation at the ankle, manipulated the bones back into place, applied a metal splint packed with cotton, bound the ankle with adhesive tape, and covered the whole with roller bandage.

Defendant called the next day and found plaintiff suffering much pain, so he took off the bandage, cut the adhesive tape and examined the ankle, and rewrapped it with slightly loosened bandage.

Defendant next called on May 16, and took off the bandages and splint to assure himself that "everything was all right." He did the same on May 18. Defendant's next call was on May 20, at which time, according to plaintiff's testimony, he told defendant that "it felt like something had slipped in there," and that the doctor examined the foot and said it was just as he had set it.

Defendant visited plaintiff occasionally thereafter until June 24, when he removed the bandages and splint, and instructed plaintiff to use crutches. At that time, according to plaintiff's evidence, the ankle was much swollen, and there was a large lump just above the instep and another on the side. His son testified:

". . . there was a knot up here on the front of the instep that looked it was right along in there, where this big bone had been shoved forward."

Plaintiff's daughter-in-law testified:

"I saw father's foot and ankle on the day that Doctor Hall removed the splint. . . . The ankle was badly swollen. There was what I would term a shelf on the front of the instep or rather the ankle' a little above the instep and the foot turned outward to the right. I saw the foot from time to time afterwards until Mr. Stockham went to Kansas City for an operation. During that time the swelling went down to some extent but the shelf and knot on the inside of the ankle did not go down. It was quite remarkably noticeable."

Plaintiff's brother testified:

"In the early fall of 1934 I observed my brother's foot and ankle several times, at his home. The ankle was swollen. There was a large knot, kind of a table, at the joint where the big bone connects onto the foot and on the upper side of the instep. I saw the ankle last in January, 1935. The ankle was enlarged and the knot was still there."

Plaintiff continued to suffer much pain during the remainder of 1934; and in January, 1935, he consulted two chiropractors, both of McPherson. One of them, a Doctor Thompson, caused an X-ray photograph to be made. He testified:

"I examined the right foot on January 17, 1935 . . . the ankle was badly swollen and there was a decided dislocation that you could feel as well as see. The larger bone in the leg was projecting out noticeably. . . . When Stockham and I went to Doctor Hall's office he examined only the X ray and said, 'It is a distinct dislocation, but it wasn't that way when I fixed it.'"

Later plaintiff's crippled condition was examined by other experts, and eventually he went to Kansas City, where an operation was performed on his ankle by Doctor Dickson, an orthopedic specialist, who decided that the mobility of the ankle joint could not be restored, and that it should be stabilized to put an end to the constant pain and to give plaintiff an ankle of the greatest usefulness. He testified:

"I stabilized the joint by making an incision down to the joint, taking off part of the articular surface of the tibia, part of the articular surface or what was left of the articular surface of the astragalus, removing all cartilage or gristle, going down here and taking away sufficient bone from both the astragalus and the tibia to allow us to bring the foot into what we considered an advantageous weight-bearing position and bringing the bare bone surface into apposition with the upper bone surface, so that those bones will grow firmly together."

Plaintiff's petition charged defendant with negligence, particularly by failing to make a thorough and proper examination of the injury, by failing to have an X ray taken of the injured ankle according to the customary and ordinary practice of careful and competent physicians and surgeons of the community, and by negligently failing to correct the dislocated bones of the ankle and ascertain that the bones he did set had remained in place.

The answer was a general denial. The cause was tried before a jury. Expert and nonexpert testimony was adduced at length.

The jury returned a verdict for plaintiff and judgment was entered thereon.

Defendant appeals, assigning various errors which center chiefly on the sufficiency of the evidence to sustain the verdict.

There is usually considerable difficulty in proving a case of malpractice on the part of a physician and surgeon. There are—as there ought to be—limitations to the extent to which nonprofessional witnesses can testify on an issue of fact of malpractice; and there is

quite understandable reluctance on the part of expert witnesses to give testimony tending to reflect on the professional skill of a fellow-craftsman. But a careful perusal of the record requires this court to hold that there was both professional and nonprofessional testimony sufficient to withstand defendant's demurrer thereto. And we need hardly repeat what this court has so often said, that in determining the propriety of a ruling on a demurrer to evidence it is of no consequence how voluminous, how plausible, may have been the evidence adduced which tended to disprove the material allegations of the petition. (*Windus v. Bodecker,* 132 Kan. 857, 297 Pac. 702; *Hill v. Southern Kansas Stage Lines Co.,* 143 Kan. 44, 49, 53 P. 2d 923, and citations.)

This rule has been applied specifically in malpractice cases. (*Yard v. Gibbons,* 95 Kan. 802, 806, 149 Pac. 422; *James v. Grigsby,* 114 Kan. 627, 220 Pac. 267; *McMillen v. Foncannon,* 127 Kan. 573, 576, 274 Pac. 237; *Windus v. Bodecker,* supra; *Flentie v. Townsend,* 139 Kan. 82, 30 P. 2d 132.)

Counsel for defendant cite many cases which hold that the negligence of a physician in the treatment of bodily ailments can only be determined by expert testimony. In this jurisdiction the rule is not quite so narrow. In *Yard v. Gibbons,* 95 Kan. 802, 149 Pac. 422, it was said:

"Ordinarily only physicians and surgeons of skill and experience are competent to testify as to whether a patient has been treated or an operation performed with a reasonable degree of skill and care, but testimony as to many matters connected with the treatment of a patient, such as the statements and acts of the physician or surgeon as well as the external appearances and manifest conditions which are observable by any one, may be given by nonexpert witnesses." (Syl. ¶ 3.)

To the same effect was *Sly v. Powell,* 87 Kan. 142, 123 Pac. 881. See, also, *Stecher v. London Guarantee & Accident Co.,* 133 Kan. 89, 298 Pac. 754; and *Son v. Eagle-Picher M. & S. Co.,* 144 Kan. 146, 151, 58 P. 2d 44.

Defendant adduced evidence which doubtless made a good talking point before the jury—that the untoward condition of plaintiff's ankle as shown by the X ray in 1935 was caused by a pony lying down on him or with him out in a wheat field some months after defendant had ceased his professional ministrations concerning it. After being dismounted plaintiff had to hobble to the house with the aid of a piece of board as a crutch. But there was evidence, both

lay and professional, that the condition of the ankle as revealed by the X ray in 1935 was not traceable to the equestrian mishap in the wheat field nor its consequences.

Defendant made an effort to show that his failure to have timely X-ray photographs taken to ascertain the exact condition of the injured ankle, and to ascertain whether the broken bones were knitting as they should, was induced by plaintiff himself—that when defendant first arrived in response to plaintiff's call, the latter said: ·

"Now don't say hospital to me because I am not going. I can't afford it. I am broke. I have lost practically two wheat crops and it has just left me broke. I can't go to any extra expense."

But plaintiff's evidence was that no such conversation occurred. Plaintiff himself testified:

"There was nothing said between Doctor Hall and myself other than just passing the time of day."

Plaintiff's son testified:

"After Doctor Hall arrived and before he gave the anaesthetic we asked if it was necessary that he be taken to the hospital and have an X ray taken of the foot before it was set. Doctor Hall said it was not necessary."

The record contains a number of lengthy hypothetical questions propounded to the expert witnesses, in both direct and cross-examination, but it would serve no purpose to reproduce them here (*State v. Rose,* 124 Kan. 37, 38, 257 Pac. 731; *Rusco v. DeGood,* 127 Kan. 708, 715, 275 Pac. 201), nor is anything discernible therein to warrant discussion.

A diligent examination of the record reveals nothing approaching reversible error, and the judgment is therefore affirmed.