No. 42,237

Garrett Voss, an Incompetent, by and through Thelma Voss, Guardian of the person and estate of Garrett Voss, *Appellee* and *Cross Appellant*, v. Russell E. Bridwell and A. K. Sen, *Appellants*, and John I. Davies, *Cross Appellee*.

(364 P. 2d 955)

Opinion filed September 18, 1961.

*John J. Alder,* of Kansas City, argued the cause, and *Harley V. Haskin,* of Olathe, was with him on the briefs for the appellants.

*Marion W. Chipman,* of Hill City, argued the cause, and *W. H. Clark* and *Kenneth Clark,* both of Hill City, and *Howard E. Payne, W. C. Jones, Robert P. Anderson* and *H. Thomas Payne,* all of Olathe, were with him on the briefs for the appellee and cross appellant.

*Edw. M. Boddington, Jr.,* of Kansas City, argued the cause, and *Edw. M. Boddington* and *Richard J. Croker,* both of Kansas City, and *Hugh Kreamer,* of Olathe, were with him on the briefs for the cross appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is a malpractice action to recover damages against three defendants, the surgeon, the anesthetist and a resident physician. The case is here on appeal from the trial court's ruling upon separate demurrers to the petition which was alleged in two counts, on an ordinary negligence and the other under the doctrine of *res ipsa loquitur.*

The question presented is whether the petition states a cause of action against each of the three defendants on each of the two counts.

The petition was filed on the 17th day of September, 1959, by Garrett Voss, an incompetent person, by and through Thelma Voss,

his wife, the duly appointed guardian of his person and estate. After preliminary allegations concerning the plaintiff's residence and the appointment of his wife as guardian for him upon an adjudication of incompetency by the probate court of Graham County, Kansas, the petition alleged:

"3. That the said Garrett Voss was rendered an incompetent person by reason of the negligent and careless acts and omissions of the defendants, all as will be more particularly set forth herein.

"4. The defendant Russell E. Bridwell is now and was on the 28th day of August, 1958, a duly licensed and regularly practicing physician and surgeon, and was on said date engaged in the practice of medicine at the University of Kansas Medical Center and elsewhere, and said defendant maintains an office in the National Reserve Life Building in the City of Topeka, Shawnee County, Kansas.

"5. That the defendant John I. Davies is now and was on the 28th day of August, 1958, a licensed and practicing physician, and was on said date *a member of the staff at the University of Kansas Medical Center and the supervising head of the Department of Anesthesiology at said hospital.*

"6. That said defendant is a resident of Johnson County, Kansas, and that his post office address is 2012 West 85th Terrace in said County.

"7. That the defendent A. K. Sen was on the 28th day of August, 1958, *in residency at the University of Kansas Medical Center, and in the Department of Anesthesiology working under the direct supervision and control of the defendant John I. Davies,* but plaintiff does not know, and is therefore unable to state whether said defendant A. K. Sen was duly licensed to practice medicine within the State of Kansas or elsewhere; that said defendant is a resident of the State of Kansas, and may be served with process at St. Margaret's Hospital, Kansas City, Wyandotte County, Kansas.

"8. That on the 28th day of August, 1958, Garrett Voss sought the medical advice of the defendant Russell E. Bridwell for the purpose of procuring medical treatment for a mastoid infection of the ear, the exact nature and type of infection being unknown to the plaintiff, but being within the knowledge of the defendants herein and particularly the defendant Russell E. Bridwell.

"9. That said defendant Russell E. Bridwell, after having conducted an examination of the plaintiff herein, advised plaintiff that it would be necessary that an operation be performed for the purpose of curing and treating said mastoid infection, and further advised plaintiff that immediate surgery thereof should be had.

"10. *Plaintiff,* [in reliance upon the statements of the said Russell E. Bridwell to the above effect,] *did then and there engage and employ the services of the said defendant Russell E. Bridwell to perform said surgical operation and treatment,* [and the said defendant Russell E. Bridwell did then and there undertake such employment, and did agree to treat, operate, and heal the said Garrett Voss, and to use and employ the ordinary medical skill, treatment, and means generally employed and used by physicians and surgeons in the practice of the medical profession within the community.]

"11. That the said Garrett Voss [relying upon the diagnosis, recommendation, and prescribed surgery consented thereto,] and said *defendant Russell E. Bridwell procured the admission of the plaintiff herein to said Medical Center, making all necessary arrangement for the performance of said operation and surgery including the assistance of nurses and particularly the services of an anesthesiologist.*

"12. That the *defendant, John I. Davies,* was the head of the Department of Anesthesiology of the University of Kansas Medical Center and *was responsible for and had direct control of administering anesthesia to the plaintiff and undertook the administration of anesthesia to the plaintiff through the said A. K. Sen.* Plaintiff does not know and is therefore unable to state, said information being, however, within the knowledge of the defendants, how and in what manner the defendant A. K. Sen was assigned for the purpose of administering a general anesthesia to the plaintiff herein, but plaintiff alleges the facts to be that the said *A. K. Sen,* being in residency as aforesaid in said Department of Anesthesiology as aforesaid, *was at all times herein complained of under the direct supervision and tutelage of the defendant, John I. Davies,* and the said *John I. Davies,* being the head of the Department of Anesthesiology, and *having undertaken the administration of anesthesia to the plaintiff, was responsible for and had control of the medical activities of the defendant, A. K. Sen, and was responsible for the proper administration of anesthesia to the plaintiff.*

"13. That the *defendant Russell E. Bridwell, being the operating surgeon, likewise was responsible for and had direct control of the proper preparation of the plaintiff herein as his patient, for said surgical operation including the administration of anesthesia.*

"14. Plaintiff further alleges and shows to the Court that the *defendants carelessly and negligently failed to use and employ ordinary medical skill, care and treatment generally employed by doctors of medicine, surgery and anesthesiology in the community, and that said defendants were negligent and careless in the preparation of the plaintiff for surgery and the administration of a general anesthesia to the plaintiff in the following particulars, to-wit:*

"A. *The defendant A. K. Sen, after having administered an anesthetic to the plaintiff and therefore causing plaintiff to become unconscious, thereafter negligently and carelessly, and while said plaintiff was unconscious from said anesthetic, inserted an endotracheal tube into the esophagus of the plaintiff instead of into and past the larynx of the plaintiff.*

"B. The *defendants,* after the negligent and careless acts of the defendant A. K. Sen, *failed to observe that said endotracheal tube had wrongfully and carelessly been inserted as aforesaid,* when the defendants saw or by the exercise of reasonable and ordinary care and medical skill could have seen that said insertion of said endotracheal tube had been improperly made.

"C. The *defendants* negligently and carelessly failed to take the ordinary and customary medical precautions to determine the blood pressure, respiration, and pulse count of the plaintiff, while plaintiff was unconscious from a general anesthetic.

"D. The *defendants* failed to observe that said endotracheal tube was not performing its function of supplying air and oxygen to the plaintiff while

plaintiff was unconscious from anesthesia, when the defendants saw or by the exercise of ordinary medical skill and observation could have seen that plaintiff was not obtaining air and oxygen.

"E. The *defendants* negligently and carelessly failed to observe that plaintiff was becoming cynotic from lack of oxygen, when they saw or by the exercise of ordinary care and medical skill could have seen the plaintiff turning blue and becoming cynotic.

"F. The *defendants* negligently and carelessly failed to observe that said endotracheal tube was improperly transmitting air and oxygen to the plaintiff's stomach and abdominal region, and not to the plaintiff's lungs and blood stream, and that by virtue thereof plaintiff's stomach and abdominal region was becoming inflated, greatly and unnaturally distended, when defendants by the exercise of ordinary care and skill could have seen and observed said unnatural distension.

"G. That said *defendants* negligently and carelessly permitted the plaintiff to be so deprived of oxygen and pulmonary ventilation for such a long period of time, the exact period of time being unknown to the plaintiff, that plaintiff suffered irreparable damage to his body, nerves, tissue, and particularly his brain, all as will be more particularly set out hereafter.

"H. That the *defendants* saw or by the exercise of ordinary medical care and skill could have seen that plaintiff was being deprived of pulmonary ventilation, and as a result thereof defendants knew or should have known that such deprivation would result in irreparable damage to the plaintiff, and particularly plaintiff's brain, but notwithstanding the same said defendants negligently and carelessly failed to alleviate said condition when the defendants could have done so had said defendants exercised ordinary care and medical skill, and by so doing thereby avoid irreparable damage to the plaintiff.

"15. That *as a direct and proximate cause of the negligent and careless acts and omissions on the part of said defendants* as aforesaid, resulting in the plaintiff being deprived of oxygen for a long period of time, the exact time being unknown to the plaintiff, *plaintiff was rendered decerebrate, has been rendered wholly incompetent in mind, and plaintiff's eyesight has been so impaired that plaintiff is blinded save and except the ability to discern light and dark; plaintiff is unable to talk coherently, or to control any part of his body, is unable to move or to perform any other human or bodily function without aid or assistance, and plaintiff has been and is now under the constant care of a medical doctor, and is required to have constant medication to keep plaintiff from going into convulsions, and is under constant medication and sedation.*

"16. That plaintiff has to be cared for, fed and bathed, being unable to perform any of said functions, and that said condition as aforesaid will continue so long as plaintiff lives.

"17. That prior to the 28th day of August, 1958, plaintiff was an able-bodied man, possessing unusual strength, large in stature, and robust in health, engaged in farming seven hundred twenty (720) acres of farm land, located in Graham County, Kansas, earning an average conservative sum from said farming endeavor of Four Thousand ($4,000.00) Dollars per year.

"18. That plaintiff was fifty-five (55) years of age at the time plaintiff was totally incapacitated as aforesaid, and plaintiff had a life expectancy of approximately nineteen (19) years.

"19. That by reason of plaintiffs total incapacity, plaintiff will be unable to perform any type of work so long as plaintiff shall survive.

"20. That in addition thereto plaintiff has incurred medical, hospital, nursing and expenses for medication in the sum of Four Thousand One Hundred Thirty-eight and 03/100 ($4,138.03) Dollars to date, and will be required in the future to expend large sums for drugs, doctors, hospital, nursing, and other medical care, the exact amount being unknown at this time.

"21. That by reason of said negligent and careless acts and omissions as aforesaid on the part of said defendants, plaintiff herein has suffered pain, shock, physical and mental disability, and will in the future be permanently incapacitated physically and mentally, all to his aggregate damages in the sum of Two Hundred Thousand ($200,000.00) Dollars, and costs of suit." (Emphasis and brackets added.)

In Count II of the plaintiff's cause of action against the defendants paragraph 1 through 13 inclusive of the first cause of action were incorporated by reference. It further alleged:

"2. That the attempted aforesaid operation and surgical treatment of the said Garrett Voss, and *the procedure followed therein, and the instrumentalities employed in connection therewith, including the administration of a general anesthetic to the plaintiff, and the use and employment of said endotracheal tube were under the entire, complete and exclusive supervision and control of all of said defendants.*

"3. That during all of the period of time complained of on August 28, 1958, the said *Garrett Voss was unconscious* due to the administration of said anesthesia and such other drugs as may have been administered to him by said defendants, and that plaintiff has never since being rendered unconscious as aforesaid regained sufficient mental competence to know in any particular what transpired, and plaintiff exercised no control or voluntary action during said time.

"4. Plaintiff alleges the fact to be, however, that *the irreparable damage and injury to the plaintiff complained of in Count I of plaintiff's petition do not ordinarily occur in the process of a mastoid operation or in the absence of negligence in the administration of an anesthetic, and in the insertion of an endotracheal tube.*

"5. *That in truth and in fact said mastoid operation was never performed by the defendants for reasons known to the defendants and unknown to the plaintiff.*

"6. That plaintiff was without knowledge of the proper technique, manner or methods of operating procedure, of administering an anesthetic and other drugs in connection with said operating procedure, and was without knowledge of the proper technique, manner, or methods of supplying sufficient pulmonary ventilation during the time within which plaintiff was unconscious, and plaintiff relied wholly upon the defendants to render said treatment and operation, and the necessary supervision and control thereof in a proper, careful, and medically skillful manner.

"7. *That at the time plaintiff entered said hospital and immediately prior to being placed under anesthesia by said defendants, plaintiff was neurologically sound and physically fit in mind and body.*

"8. That said *defendants carelessly and negligently caused and permitted said operation, preparation, and procedure to be rendered in such a manner as to cause the plaintiff to be rendered decerebrate and totally incapacitated,* all as alleged in Count I hereof, which by reference is hereby made a part hereof as though fully set out herein.

"9. Plaintiff alleges the fact to be that *without negligent and careless acts upon the part of said defendants in the preparation of plaintiff and treatment and surgical care, plaintiff's injuries would not have occurred.*

"10. Plaintiff further alleges and shows to the Court that certain medical charts were kept with regard to the procedure employed by said defendants, and that plaintiff, by and through his guardian and attorneys have heretofore made demand for a right to inspect and make copies thereof, but that said right so to do has been denied the plaintiff, his guardian, and attorneys, said Medical Center making claim that said charts and medical records are the personal property of said Medical Center.

"11. Plaintiff alleges on information and belief that if said medical charts were made available the specific acts of negligence could be by the plaintiff ascertained, but plaintiff being denied access thereto, such acts of negligence are within the knowledge of the defendants." (Emphasis added.)

Thereupon allegations concerning the plaintiff's injury and damage similar to those alleged in Count I were set forth, and the petition concluded with a prayer for judgment against the defendants in the sum of $200,000 and costs.

The trial court overruled the motion of the defendant Bridwell to strike various allegations from Counts I and II, except for those allegations set forth in paragraphs numbered 10 and 11 within the brackets. These allegations were *stricken only from Count II* in the petition. The trial court also overruled motions of the defendants Davies and Sen to strike and to make the petition definite and certain.

Thereafter the trial court overruled the "Demurrer of Joint Separate Defendants Bridwell and Sen," challenging the sufficiency of the petition to state a cause of action, as to each count of the petition, but sustained a similar demurrer of the defendant Davies as to both counts of the petition, granting the plaintiff twenty days in which to amend as to the defendant Davies, and further granting Davies twenty days thereafter to plead.

Appeal has been duly perfected by Bridwell and Sen from the order of the trial court overruling their respective demurrers to the petition, and the plaintiff has appealed from the order sustaining the demurrer of the defendant Davies.

Throughout the remainder of this opinion the defendants, Bridwell (appellant), Sen (appellant), and Davies (cross appellee),

will be referred to by name, and the petitioner, Garrett Voss (appellee and cross appellant), will be referred to as the plaintiff to avoid confusion.

The petition upon the record presented herein as we construe it under recent decisions is entitled to a liberal construction. (*Hickert v. Wright,* 182 Kan. 100, 319 P. 2d 152; *Gibbs v. Mikesell,* 183 Kan. 123, 325 P. 2d 359; and *Wycoff v. Winona Feed & Grain Co.,* 187 Kan. 98, 353 P. 2d 979.)

In construing a petition for the purpose of determining its effect, allegations are to be liberally construed with a view to substantial justice between the parties. (G. S. 1949, 60-736.) The general rule is that against a demurrer the petition of the plaintiff is entitled not only to the benefit of the facts pleaded, which must be taken as true, but to all reasonable inferences that may be derived therefrom. (*Cassity v. Brady,* 182 Kan. 381, 321 P. 2d 171, and authorities cited therein.) In construing the sufficiency of any pleading all of the allegations thereof are to be construed together, and it is improper to segregate allegations and determine their sufficiency without regard to the context of the whole pleading. (*Fyne v. Emmett,* 171 Kan. 383, 233 P. 2d 496; *Emrie v. Tice,* 174 Kan. 739, 258 P. 2d 332; and *Kitchen v. Smith,* 184 Kan. 188, 334 P. 2d 413.)

Where a general demurrer challenges the sufficiency of the entire petition to state a cause of action, as here, the demurrer must be overruled if the pleading so challenged states a cause of action on any theory. (*Fernco, Inc., v. Kennedy,* 181 Kan. 25, 309 P. 2d 400; *Crabb v. Swindler, Administratrix,* 184 Kan. 501, 337 P. 2d 986; and *Wycoff v. Winona Feed & Grain Co.,* supra.)

When the plaintiff in an action has two or more distinct reasons for obtaining the relief sought, or when there is more or less uncertainty as to the grounds of recovery or as to the exigencies of proof, the petition may set forth a single claim in more than one cause of action or in separate counts. The pleader may state his case in as many ways as he sees fit in separate causes of action in the alternative to meet any possible phase of the evidence. (*Vakas, Administratrix v. Collins,* 185 Kan. 103, 107, 340 P. 2d 99, and authorities cited therein.)

In *Emrie v. Tice,* supra, the court was confronted with a malpractice action to recover damages for injuries resulting from X-ray treatments, and the court held the separate demurrers to the first cause of action based on specific acts of negligence, and to the

second cause of action based on the theory of *res ipsa loquitur*, were properly overruled for the reasons stated in the opinion.

Thus, in the instant case if the plaintiff has properly alleged a cause of action in each of the alternative counts, he may attempt to prove specific acts of negligence on the part of the defendants and still rely on *res ipsa loquitur*, subject to the qualification that if his evidence goes so far as to fully explain the cause or causes of his injury, he loses the right to rely on *res ipsa loquitur*, but an unsuccessful attempt to prove specific acts of negligence on the part of the defendants would not deprive the plaintiff of such right. (See, *Kemalyan v. Henderson*, 45 Wn. [2d] 693, 277 P. 2d 372.) The following language was used in *Emrie v. Tice*, supra:

"It has been said where specific acts of negligence are proved the doctrine of *res ipsa loquitur* does not apply. (*Waddell v. Woods*, 158 Kan. 469, 471, 148 P. 2d 1016.) Appellee's theory of the second cause of action was not predicated on specific acts of negligence. His idea clearly was to file the second cause of action on the theory of *res ipsa loquitur* and to rely on it in the event he failed to establish the specific acts of negligence pleaded in the first cause of action. In order, however, to plead fully the circumstances and conditions, as far as he was able to do so, under which he submitted himself to appellant for treatment, which have been stated and need not be repeated, he made paragraphs 1, 2 and 3 of count one a part of count two . . ." (p. 745)

For text authority on the procedural effect of *res ipsa loquitur* see Prosser, Law of Torts, 2nd Ed., § 43, pp. 211 to 215, incl.; and 37 Calif. L. Rev. 183, at p. 214.

Has the plaintiff alleged a cause of action against each of the defendants on each of the alternative counts in the petition?

It is conceded in the brief of Bridwell and Sen that Count I of the petition as tested on demurrer states a cause of action against Sen.

Rules which have become firmly established in this jurisdiction from decisions concerning the liability of physicians and surgeons in malpractice cases will be summarized, since all of the parties in this action rely upon these rules.

The relationship between a physician and his patient, implied in law by reason of the physician's undertaking, is that he possess that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices, or similar communities, having due regard for the advance in medical or surgical science at the time;

that he will use such learning and skill in his treatment of the patient with ordinary care and diligence; and that he will use his best judgment in all cases of doubt as to the proper course of treatment. This rule is founded upon considerations of public policy, its purpose being to protect the health and lives of the public. (*Erastus Tefft v. Hardin H. Wilcox* [1870], 6 Kan. 46; *Pettigrew v. Lewis*, 46 Kan. 78, 26 Pac. 458; *Saylor v. Brady*, 114 Kan. 764, 220 Pac. 1047; *Goheen v. Graber*, 181 Kan. 107, 309 P. 2d 636, and cases cited in the latter decision.)

On the *facts* presented by the evidence in *Goheen v. Graber*, supra, it was proper to say:

". . . A physician is not a guarantor of good results, and civil liability does not arise merely from bad results, nor if bad results are due to some cause other than his treatment . . ." (p. 112.)

The duty of a physician to his patient is not affected by the fact that the service rendered is gratuitous, or by the fact that the physician was employed by a third person, so that no contractual relation existed between the physician and the patient. (41 Am. Jur., Physicians and Surgeons, § 79, p. 198; and see, *Rule v. Cheeseman, Executrix*, 181 Kan. 957, 317 P. 2d 472.)

In *Hershey v. Peake*, 115 Kan. 562, 223 Pac. 1113, the following language from 30 Cyc. 1583 was approved:

"It is ordinarily sufficient for plaintiff, in an action for malpractice, to aver that defendant was a physician and surgeon; that plaintiff retained and employed him as such to attend upon him; that he accepted and entered upon such employment, yet conducted himself in an unskillful and negligent manner, whereby plaintiff was injured, to his damage, etc. Want of skill and care on the part of the physician must be alleged, and also the specific acts of commission or omission concerning which negligence is imputed." (p. 567.)

Bridwell relies upon the general rule that a physician or surgeon is presumed to have exercised his legal duty of ordinary care and skill and, in the absence of an allegation in the petition to the contrary, it is presumed that he possesses that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices, or similar communities, and that he carefully and skillfully operated on the patient. (*Cummins v. Donley*, 173 Kan. 463, 249 P. 2d 695.)

It is the contention of Bridwell that he could not be chargeable with negligence in a matter over which he had no duty; that the charges of negligence all involve the *administration of an anesthetic* and the insertion of an endotracheal tube in connection therewith;

and that there is no charge in the petition that the so-called negligence was the result of acts or omissions which he had a duty to perform; and that the mere failure to perform creates no negligence if there was no duty. (Citing, *Ramsland v. Shaw*, ____ Mass. ____, 166 N. E. 2d 894; and *Emrie v. Tice*, supra.)

It is contended Bridwell's duties as the general surgeon do not encompass the administration of the anesthetic. It is argued:

"It is common knowledge that the fields of medicine have become highly specialized. The field of anesthetics has developed experts, called anesthesiologists, whose duties are the administration of anesthetics. He has duties independent of the surgeon. Each must pursue and apply his specialty with his own degree of skill, care and discretion, exercising his own best judgment, for the benefit of the patient and not for another doctor.

"The petition does not charge Dr. Bridwell with any training or specialized knowledge in the field of anesthetics or anesthesiology. Quite to the contrary, it charges the administration of the anesthetic by A. K. Sen was a part of the service of the Department of Anesthesiology of the University of Kansas Medical Center. Specialists in that branch. It must be assumed that plaintiff accepted the service of the anesthesiology department by implied consent, because there is no charge or contention that the service was without authority or an assault or trespass upon the person of plaintiff."

Cases from foreign jurisdictions are cited to uphold the foregoing proposition of law propounded for adoption by the court. The factual situation presented in most of the cases cited makes them irrelevant to the issue at hand. Those most nearly in point are *Thompson v. Lillehei* [Minn., 1958], 164 F. Supp. 716, sustained on appeal in 273 F. 2d 376; 13 A. L. R. 2d 11s; 31 A. L. R. 2d 885s; *Huber v. Protestant Deaconess Hospital, etc.*, 127 Ind. App. 565, 133 N. E. 2d 864; *Dohr v. Smith* [Fla.], 104 So. 2d 29; *Brossard v. Koop*, 200 Minn. 410, 274 N. W. 241; *Brown v. Bennett*, 157 Mich. 654, 122 N. W. 305; and *Wiley v. Wharton*, 68 Ohio App. 345, 41 N. E. 2d 255.

Considerable reliance is placed upon *Thompson v. Lillehei*, supra. There the plaintiff was a blood donor for a controlled cross circulation heart operation on her eight year old daughter, at the University of Minnesota Medical School. Her husband made all arrangements through Dr. Lillehei, a salaried member of the University of Minnesota medical staff with teaching and surgical duties assigned by his superior. Written authorization for the operation was given to the "staff of the University Hospitals." Prior to surgery plaintiff's husband consulted with Dr. Lillehei who assured him there was very little danger involved to the blood donor, and that pre-

cautions would be taken to prevent an air embolism. In the course of surgery, and while the plaintiff was giving blood, there was evidence the bottle containing glucose and water from which she was fed intravenously became empty and caused her to receive bubbles of air in her veins, diagnosed as air embolisms, as a result of which the operation to the child was abandoned.

The plaintiff allegedly as a result of the air embolism suffered severe and permanent brain damage, including physical and mental change. Suit was brought against six doctors, among which Dr. Lillehei was the chief operating surgeon. The district court held:

". . . There was no showing that Lillehei appointed or employed Dr. X or others in the operating room, or that he had any supervision or control over Dr. X or others at the donor's table, or that he had any knowledge of any negligent act being taken by others. Absent this, the doctrine of 'respondeat superior' is inapplicable and Lillehei has no vicarious responsibility . . ." (pp. 720, 721.)

And further in the opinion the district court said:

"And even assuming that Lillehei was 'surgeon-in-charge' or 'captain of the ship,' as urged, does it follow that he is responsible for the negligence, if any, of an anesthesiologist such as Dr. X assigned to the case by his own superior, exercising his own independent special medical knowledge in performing his duties without any specific directions from Lillehei? I don't think so. The cases so indicate . . .

.     .     .     .     .     .     .     .     .     .     .     .     .     .

"To extend the doctrine of *respondeat superior* to a situation such as that reflected in the evidence would be to strain the doctrine beyond the basis for its creation. See Prosser, Torts, 2d Ed. 1955, Sec. 62. There is no evidence that Lillehei engaged or directed Dr. X or any of the others in the operating room, or that he had the authority to do so. The evidence is to the contrary. The only evidence is that Lillehei was the one through whom the operation was arranged—the one who dealt with the plaintiffs in connection with it. This relationship does not spell out responsibility by Lillehei for every event which transpired in the operating room . . ." (p. 721.)

The Federal Court of Appeals, Eighth Circuit, sustained the district court on the ground, among others, that the evidence did not establish Dr. Lillehei was the "surgeon in charge" or that he exercised supervision over those participating in the operative procedures so as to require that he, under the doctrine of *respondeat superior*, stand responsible for the alleged negligent conduct of those under his supervision. In the opinion it was said:

". . . As applied to physicians and surgeons in malpractice cases, the usual standards of ordinary care are modified to some extent in recognition of the fact that the practice of medicine is a special art. Thus, under Minne-

sota law, a physician or surgeon is not an insurer; '[h]e is only required to possess the skill and learning possessed by the average member of his school of the profession in good standing in his locality, and to apply that skill and learning with due care.' . . ." (p. 381.)

In the *Wiley* case the anesthesiologist forced a needle into the bony structure of the spine causing the needle to break, resulting in injury which the court held was *prima facie* negligence. However, the court held that a surgeon employed to perform an operation upon a patient is not liable for the negligent acts of a fellow surgeon, engaged by him with the *implied* consent of the patient to administer the necessary anesthetic, when it appears there was no negligence in the employment, and no participation, active or passive, in the negligent conduct of the other person.

In determining the sufficiency of the petition here under attack on demurrer, we cannot reach beyond the allegations of the petition itself. It should be observed in the *Lillehei* case the court had before it the benefit of all the evidence after a trial, and many of the other cases relied upon by Bridwell fall in this category.

. Here the petition with particularity alleges specific acts and negligent omissions on the part of each of the defendants Bridwell and Sen. It should be observed that the petition alleges Bridwell made arrangements for the performance of the operation, including the services of an anesthesiologist, and that Bridwell, being the operating surgeon, *was responsible for and had direct control of the proper preparation of the plaintiff as his patient, including the administration of anesthesia.* Thus, in addition to specific acts and omissions charged as negligence against Bridwell, the petition alleges he was responsible for any negligent acts of Sen. This would be under the doctrine of *respondeat superior.*

The court is not called upon to write a treatise on the law of malpractice embracing all contingencies which the evidence may ultimately disclose the facts to be in this case. In rejecting the contentions of Bridwell we simply hold, upon all the confronting facts and circumstances here presented, a cause of action is stated in Count I against Bridwell. In other words, where a person undertakes to administer anesthesia to a patient and fails to use due care in so doing, he is not the only one who *under all circumstances* may be held liable for the resulting injury.

It is an established rule that a physician or surgeon must exercise due care in selecting his assistants, and on the simplest principles of law, agency, or of master and servant, a physician or surgeon

may be liable for the neglect or fault of his apprentice, agent or employee, such as an assistant who is working under his direction, for injury resulting therefrom to a patient. The fact that a physician's assistant is a member of the same or a similar profession does not make the rule of *respondeat superior* inapplicable. (*Natanson v. Kline*, 186 Kan. 393, 350 P. 2d 1093; 41 Am. Jur., Physicians and Surgeons, § 112, p. 223; and 70 C. J. S., Physicians and Surgeons, § 54e, p. 978.)

In determining whether a person is the servant of another it is necessary that he not only be subject to the latter's control or right of control with regard to the work to be done and the manner of performing it, but that this work is to be performed on the business of the master or for his benefit. Actual control, of course, is not essential. It is the right to control which is determinative. On the other hand, the right to supervise, even as to the work and the manner of performance, is not sufficient; otherwise a supervisory employee would be liable for the negligent act of another employee though he would not be the supervisor or master of that employee in the sense the law means it. (Restatement, Agency 2d, § 220[1], [1958]; and *Yorston v. Pennell, Appellant* [1959], 397 Pa. 28, 39, 153 A. 2d 255.)

In *Jackson v. Joyner*, 236 N. C. 259, 72 S. E. 2d 589, a physician performing an operation selected and arranged for the help of an anesthetist employed by a hospital and had full power and control over him in the performance of his duties during the operation. It was held the anesthetist was, during the period of the operation, the agent of the physician, and the physician was liable for the negligence of the anesthetist in the administration of the anesthesia.

For similar malpractice decisions applying the doctrine of *respondeat superior* in other jurisdictions see *Minogue v. Rutland Hospital* [1956], 119 Vt. 336, 125 A. 2d 796; *Ybarra v. Spangard* [1944], 25 C. 2d 486, 154 P. 2d 687, 162 A. L. R. 1258; *Meadows v. Patterson* [1937], 21 Tenn. App. 283, 109 S. W. 2d 417; *Heimlich v. Harvey* [1949], 255 Wis. 471, 39 N. W. 2d 394; *Simons v. Northern Pac. Ry. Co. et al.* [1933], 94 Mont. 355, 22 P. 2d 609; *McConnell, Appellant, v. Williams* [1949], 361 Pa. 355, 65 A. 2d 243; *Com. to the use of Orris v. Roberts et al., Aplnts.* [1958], 392 Pa. 572, 141 A. 2d 393; and *Beadles v. Metayka* [1957], 135 Colo. 366, 311 P. 2d 711. Vicarious liability is discussed in Prosser, Law of Torts, 2nd Ed., Ch. 12, p. 350.

It is the contention of Davies that the petition fails to allege a duty and a breach thereof as to him. Therefore, he argues the petition fails to state facts sufficient to clearly and fairly advise him of the precise nature of plaintiff's claim against him. Davies' whole argument is founded upon the proposition that an attempt has been made in the petition to reach out and join him as a party merely because he is the Head of the Department of Anesthesiology at the University of Kansas Medical Center, and to impose vicarious liability upon him as a physician by reason of his official status alone.

We do not construe the petition as being so restricted. Had Davies been sued only in his official capacity as Head of the Department his demurrer would have to be sustained. (*Gresty v. Darby*, 146 Kan. 63, 68 P. 2d 649.) In *Thompson v. Lillehei*, supra, the action was dismissed as to the University of Minnesota and the Regents of the University on the ground each was a state governmental body, immune from suit. For a discussion of the doctrine of governmental immunity under Kansas law see *Wendler v. City of Great Bend*, 181 Kan. 753, 316 P. 2d 265.

Where the employer is a state governmental agency and immune from tort liability under the governmental function doctrine, the official cloak of immunity does not extend to the negligent employee, as an individual, so as to shield him from answering for his wrongful act by which another has suffered injury. (*Rose v. Board of Education*, 184 Kan. 486, 337 P. 2d 652.)

Reference to Davies as Head of the Department in the petition serves to properly identify him, but the petition as construed on demurrer, in our opinion, states a cause of action against Davies in his capacity as an individual. This has been indicated by the emphasized portions in paragraph 12 of the petition as heretofore quoted. It is alleged Davies was responsible for and had *direct control of administering anesthesia to the plaintiff*, and undertook the administration of anesthesia to the plaintiff through Sen. Thereafter, the petition set forth specific acts and omissions charged as negligence against Davies similar to those charged against Bridwell. It alleged sufficient facts to show Davies was responsible for the negligent acts of Sen.

Under the doctrine of *respondeat superior* a person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other. (Restatement, Agency 2d, § 226, [1958]; *McCon-*

nell, Appellant, v. Williams, supra; and Dickerson v. American Sugar Refining Co., 211 F. 2d 200.)

A petition similar to the pleading here under attack was filed against a physician who was a staff member at the University of Kansas Medical Center in Emrie v. Tice, 174 Kan. 739, 258 P. 2d 332. The defendant there relied upon Warren v. City of Topeka, 125 Kan. 524, 265 Pac. 78, apparently to support his assertion of the governmental immunity doctrine, but the court rejected the doctrine of immunity in the following language:

". . . The case is not controlling. Among other distinguishing features there was privity of contract between appellee and appellant in the instant case. If appellant has a valid defense on the theory of being engaged in the performance of a governmental function it does not affirmatively appear in the petition and cannot be raised on demurrer to the petition." (p. 744.)

In the Warren case a contract was made by a municipal corporation with an individual for the concessions of a city park, requiring of him the performance of certain specific duties for the benefit of the public generally. The individual contractor neglected and omitted to perform such duties required by his contract with the city, and was held not to be individually liable for damages to a private citizen for loss on account of such neglect or breach, unless there was a privity of contract between such citizen and the individual contractor.

Even under the Warren decision we think the petition herein sufficient to allege a cause of action against Davies in his individual capacity, because it alleges that the plaintiff engaged and employed Bridwell to perform the surgery for which Bridwell in turn arranged for the services of an anesthesiologist.

Does the petition state a cause of action in Count II under the doctrine of res ipsa loquitur?

Some of the general rules of law applicable to physicians and surgeons in malpractice cases have heretofore been stated. Additional rules with authoritative citations have been quoted or stated in Rhodes v. DeHaan, 184 Kan. 473, 337 P. 2d 1043; and in Riggs v. Gouldner, 150 Kan. 727, 728, 96 P. 2d 694. These rules have become firmly established in this jurisdiction and are made a portion of this opinion as fully and completely as if set forth herein at length.

It must be conceded the doctrine of res ipsa loquitur can have no application in a suit against a physician or surgeon which involves the merits of a diagnosis or of scientific treatment. The

physician or surgeon is not required at his peril to explain why any particular diagnosis was not correct, or why any particular scientific treatment did not produce the desired result. Based upon previous decisions of this court (*Rhodes v. DeHaan,* supra; and *Natanson v. Kline,* supra) the doctrine of *res ipsa loquitur* has no application where, in an ordinary suit against a physician or surgeon for malpractice, the only showing is that the desired result of an operation or treatment was not accomplished.

This court has said the doctrine of *res ipsa loquitur* is not a rigid or arbitrary doctrine to be mechanically applied, but a rule to be cautiously applied, dependent upon the circumstances of the case. (*Waddell v. Woods,* 158 Kan. 469, 148 P. 2d 1016; *Pierce v. Schroeder,* 171 Kan. 259, 232 P. 2d 460; *Lamb v. Hartford Accident & Indemnity Co.,* 180 Kan. 157, 300 P. 2d 387; *Rhodes v. DeHaan,* supra; 38 Am. Jur., Negligence, § 303; and 65 C. J. S., Negligence, § 220[6].) The difficulty courts often encounter is the application of the doctrine to the situation disclosed by the facts and circumstances alleged in the petition. This was recognized in *Lamb v. Hartford Accident & Indemnity Co.,* supra.

Established general rules in this jurisdiction which particularly militate against application of the doctrine of *res ipsa loquitur* in malpractice cases are: (1) That a physician or surgeon *is presumed to have carefully and skillfully treated or operated* on his patient, and *there is no presumption of negligence to be indulged from the fact of injury or adverse result* by reason of such treatment or operation; and (2) To establish liability in a medical malpractice case there must be proof by *expert medical testimony* that there was a lack of due care or that approved procedure and methods were not followed.

After the rule in (2) above was stated in *Riggs v. Gouldner,* supra, its limitations were recognized in the following language:

"This does not mean, however, that there may not be certain facts concerning which persons not medical experts are permitted to testify. This court has said in numerous cases that the general rule applies only to such matters as are clearly within the domain of medical science, and that matters that are within the common knowledge of mankind may be testified to by anyone familiar with the facts. (*McMillen v. Foncannon,* 127 Kan. 573, 274 Pac. 237; *Stockham v. Hall,* 145 Kan. 291, 65 P. 2d 348; *Flentie v. Townsend,* 139 Kan. 82, 30 P. 2d 132; *Yard v. Gibbons,* 95 Kan. 802, 149 Pac. 422; *Stecher v. London Guarantee & Accident Co.,* 133 Kan. 89, 298 Pac. 754.) . . ." (pp. 728, 729.)

Regarding the presumption in medical malpractice cases stated

in (1) above, it is important to observe the plaintiff in Count II of the petition alleged *the mastoid operation* for which he engaged Bridwell as a surgeon *was never performed.*

Our decisions cannot be interpreted as holding that under no circumstances might the condition in which a patient has been left, as a result of his submission to an operation or treatment, give rise to an application of the doctrine of *res ipsa loquitur;* or that under no circumstances may an operation or a treatment, however unreasonable and plainly destructive for curative purposes, give rise to an application of the doctrine, despite the empirical and professional veil. Each case must stand upon its own bottom. In *Emrie v. Tice,* supra, the doctrine of *res ipsa loquitur* was extended by a unanimous court to X-ray treatments upon the facts there alleged in a petition. Previously, a divided court had rejected application of the doctrine in an X-ray case on the facts alleged in *Waddell v. Woods,* supra. (See, *Rhodes v. DeHaan,* supra, at p. 478.)

Courts in other jurisdictions have generally restricted application of the doctrine of *res ipsa loquitur* in malpractice cases to situations where a layman is able to say, as a matter of common knowledge and observation, that the consequences of professional treatment were not such as would ordinarily have followed if due care had been exercised.

A respectable line of authorities in other jurisdictions has made a distinction in medical malpractice cases between the failure to secure results, and the occurrence of something more unusual and not ordinarily found where the service performed followed the usual procedure of those skilled in that particular practice.

In *Meadows v. Patterson,* 21 Tenn. App. 283, 109 S. W. 2d 417, damages were sought for the loss of an eye which was injured in some manner while the plaintiff was under the influence of an anesthetic, during or following an operation for appendicitis, and the court held the doctrine of *res ipsa loquitur* applicable. The court said in the opinion:

". . . However, where, as in this case, the liability of the physician or surgeon is predicated upon alleged negligence for want of reasonable care of the patient while unconscious and not upon an alleged want of skill in diagnosis or treatment, we think a practical administration of justice dictates the application of the doctrine when it appears that a sound and unaffected member of the body is injured or destroyed while the patient is unconscious and under the immediate and exclusive control of the physician. In no other

way, under usual and ordinary conditions could the patient obtain redress for such an injury, and it is no hardship upon the defendant to explain, as he alone can, how the injury occurred. If innocent of any wrong, the door of escape is left open. The distinction between such a case and the ordinary malpractice case is recognized and upheld in the case of *Vonault v. O'Rourke*, 97 Mont., 92, 33 P. (2d), 535, where other holdings of like import are cited and discussed." (pp. 286, 287.)

In *Meyer v. St. Paul-Mercury Indemnity Co.*, (La.), 61 So. 2d 901, a patient submitted herself to the care and custody of an anesthetist and oral surgeon for the purpose of having her teeth extracted, and in the process of administering anesthetics one of the patient's teeth became dislodged and found its way into one of her lungs. The court held the patient was entitled to the aid of the doctrine of *res ipsa loquitur* in her malpractice action against the anesthetist and oral surgeon, notwithstanding the fact there was more than one defendant whose negligence could have been responsible for the patient's injury. Reference is made to a number of decisions of like import which are cited and quoted in the *Meyer* case.

The distinction between malpractice cases in which the doctrine of *res ipsa loquitur* is applicable and those in which it is not was given in *Sanders et ux. v. Smith*, 200 Miss. 551, 27 So. 2d 889, as follows:

". . . the test, generally, is not that the result of the operation was unusual and unexpected, or even fatal, alone and by itself, because, without an abnormal and rare end to operation, there would not exist an occasion for an action in damages from it. The real question, generally, is whether or not in the process of the operation any extraordinary incident or unusual event, outside of the routine of the action of its performance, occurred, and beyond the regular scope of its customary professional activity in such oper-. ations, which, if unexplained, would themselves reasonably speak to the average man as the negligent cause or causes of the untoward consequence. If there were such extraneous interventions, then the doctrine of *res ipsa loquitur* would be applicable to call upon the defendant to explain the matter, by evidence of exculpation, if he could. The jury would then decide the issue of fact in the case." (p. 561).

Where a plaintiff seeks to take advantage of the doctrine of *res ipsa loquitur*, it is incumbent upon him to show fully a situation where it is applicable, otherwise there may be an attempt to shift the burden of proof in negligence cases by merely asserting the doctrine itself. (*Johnson v. Latimer*, 180 Kan. 720, 308 P. 2d 65.) The doctrine is a rule of evidence and not one of substantive law. In actions for damages because of the defendant's negligence, the general rule is that the negligence of the defendant is never pre-

sumed, but must be established by proof. The cases in which *res ipsa loquitur* is applicable are not exceptions to the general rule. It does not dispense with proof of negligence in personal injury cases. Rather, in cases in which the phrase is applicable, proof of negligence is made, if at all, by circumstantial evidence; that is, the proof of the injury and of the surrounding circumstances are such as to leave no reasonable conclusion to be drawn therefrom other than that the casualty happened because of the negligence of the defendant, or defendants. Basically, the conditions which must be met are that (*a*) the accident is of a kind which ordinarily does not occur in the absence of someone's negligence; (*b*) it is caused by an instrumentality within the exclusive control of the defendant or defendants; and (*c*) the possibility of contributing conduct which would make the plaintiff responsible is eliminated. (*Worden v. Union Gas System,* 182 Kan. 686, 324 P. 2d 501; *Lamb v. Hartford Accident & Indemnity Co.,* supra; and *Primm v. Kansas Power & Light Co.,* 173 Kan. 443, 249 P. 2d 647.)

We think where proper inferences may be drawn by ordinary men from approved facts which give rise to *res ipsa loquitur,* without infringing basic principles heretofore stated, there should be no reasonable argument against the availability of the doctrine in medical and surgical cases involving negligence, just as in other negligence cases, where the thing which caused the injury does not happen in the ordinary course of things when proper care is exercised. Where common knowledge and experience teach that a resulting injury would not have occurred to a patient if due care had been exercised, an *inference* of negligence may be drawn, thus giving rise to an application of the doctrine of *res ipsa loquitur,* without medical evidence which is ordinarily required to show not only what occurred but how and why it occurred.

The plaintiff herein submitted himself *for a mastoid operation* and delivered his person over to the care, custody and control of his physician who had complete and exclusive control over him, *but the operation was never performed.* At the time of submission he was neurologically sound and physically fit in mind and body, but he suffered irreparable damage and injury rendering him decerebrate and totally incapacitated. The injury was one which does not ordinarily occur in the process of a mastoid operation or in the absence of negligence in the administration of an anesthetic, and in the use and employment of an endotracheal tube. Ordi-

narily a person being put under anesthesia is not rendered decerebrate as a consequence of administering such anesthesia in the absence of negligence. Upon these facts and under these circumstances a layman would be able to say, as a matter of common knowledge and observation, that the consequences of professional treatment were not such as would ordinarily have followed if due care had been exercised.

Here the plaintiff could not have been guilty of contributory negligence because he was under the influence of anesthetics and unconscious, and the circumstances are such that the true explanation of the event is more accessible to the defendants than to the plaintiff for they had the exclusive control of the instrumentalities of anesthesia.

Upon all the facts, conditions and circumstances alleged in Count II it is held a cause of action is stated under the doctrine of *res ipsa loquitur*. This holding, however, should not be interpreted to say the doctrine is applicable in any and all cases where injury occurs to a patient while under anesthesia, or to any and all anesthesia cases.

In *Rhodes v. DeHaan,* supra, the gratuitous statement made in *Waddell v. Woods,* supra, was quoted to the effect that the doctrine of *res ipsa loquitur* "has no application to the death of a patient under an anesthetic." It is argued that if this is true, the doctrine should have no application where a patient is injured while under an anesthetic. It must be noted the statement says "while *under* an anesthetic." It does *not say* where death is caused *from* an anesthetic. Usually a patient is placed under anesthetics for the purpose of surgery. The failure of the surgery or a combination of the surgery and the anesthetic could cause death, and fall within the general rules applicable to medical malpractice cases which prevent application of the doctrine. The decision herein is not foreclosed by the foregoing statement appearing in the *Waddell* and *Rhodes* cases.

We have not overlooked *Ybarra v. Spangard,* 25 C. 2d 486, 154 P. 2d 687, 162 A. L. R. 1258, from which the plaintiff has quoted extensively in his brief. There some of the language used in discussing *res ipsa loquitur* as applicable to medical malpractice cases is inconsistent with Kansas law, and the case cannot be cited with full approval. (See, Comment by Warren A. Seavey, 63 Harv. L. Rev. 643; 25 Ins. Counsel J. 97; 30 So. Calif. L. Rev. 80; and annotation in 162 A. L. R. 1265 to 1329.)

For other cases and text authorities on the application of the doctrine of *res ipsa loquitur* in medical malpractice cases see *Cavero v. Franklin etc. Benevolent Soc.*, 36 C. 2d 301, 223 P. 2d 471; *Salgo v. Leland Stanford etc. Bd. Trustees*, 154 C. A. 2d 560, 317 P. 2d 170; *Maki v. Murray Hospital*, 91 Mont. 251, 7 P. 2d 228; *Pendergraft v. Royster*, 203 N. C. 384, 166 S. E. 285; 10 So. Calif. L. Rev. 166, 459; and 20 Minn. L. Rev. 241.

Application of the doctrine of *res ipsa loquitur* to plural defendants has been upheld many times under various circumstances. (*Worden v. Union Gas System,* supra, and authorities cited therein.) Here the facts presented are much stronger for application of the doctrine to plural defendants than were the facts in the *Worden* case, for here the petition is subject to the construction that a legal relationship exists among the several defendants which placed them in either actual or constructive control of the instrumentalities of anesthesia.

In conclusion we hold the petition states a cause of action against each of the defendants on both Counts I and II. The judgment of the lower court overruling the demurrers of Bridwell and Sen, as to each count of the petition, is affirmed. The judgment of the lower court sustaining the demurrer of Davies, as to each count of the petition, is reversed.

PARKER, C. J., dissents from that portion of the opinion holding that the petition states a cause of action in Count II under the doctrine of *res ipsa loquitur* against the defendant, John I. Davies.

PRICE, J., dissents in part, being of the opinion that the demurrer of the defendant, John I. Davies, was properly sustained.