No. 34,336

THELMA RIGGS, *Appellee,* v. R. M. GOULDNER, *Appellant.*

(96 P. 2d 694)

Opinion filed December 9, 1939.

*Glenn Porter, Getto McDonald, Dwight S. Wallace* and *William Tinker,* all of Wichita, for the appellant.

*Clarence R. Sowers, Claude E. Sowers* and *Byron Brainard,* all of Wichita, for the appellee.

The opinion of the court was delivered by

HOCH, J.: This was an action to recover damages for alleged malpractice by a physician. The case was tried by a jury which was unable to agree. It is here on appeal of defendant from orders of the court overruling a demurrer to the plaintiff's evidence and overruling motions for a directed verdict and for judgment on the record.

Briefly, the facts are that Thelma Riggs, the plaintiff, was operated upon by Dr. R. M. Gouldner, a physician and surgeon of Wichita, on September 7, 1936, and that following the operation and upon the advice of Doctor Gouldner, she was given X-ray treatments by Doctor Hagan, and that she had a subsequent operation performed by Doctor Wolfe, and that she was treated for various complaints by Doctor Mermis and Dr. John H. Wallace. The heart of the complaint is that Doctor Gouldner did not use approved methods in diagnosing plaintiff's trouble; that without pursuing adequate methods of diagnosis he determined that the patient was suffering from a malignant growth or sarcoma; that upon his advice deep X-ray treatments were employed, which proved very harmful to the plaintiff and that as a result of these treatments and the administration of certain drugs, alleged to have been prescribed by doctors subsequently treating the plaintiff at the suggestion and under the direction of the defendant, plaintiff's health was greatly impaired

and she suffered serious and permanent physical injury. Judgment was asked in the sum of $40,000.

The defendant introduced the testimony of various doctors that the methods of diagnosis used were methods generally approved and followed by physicians and diagnosticians of good standing in the locality and that the treatment prescribed was one generally used and approved by the medical profession. However, the issue here being the sufficiency of the plaintiff's evidence to establish a prima facie case, the evidence on behalf of the defendant cannot be considered except insofar as it may be supplementary to plaintiff's evidence.

Plaintiff's witnesses, in addition to herself, were her mother, Florence Riggs; her father, T. B. Riggs; Doctor Tedrick, an X-ray specialist; and Drs. H. C. Wallace and John Wallace, osteopathic physicians. The hospital record and a laboratory report were introduced as exhibits.

Before examining the evidence it is well to state some well-established rules of law applicable to malpractice actions.

A physician or surgeon is not a guarantor of the correctness of his diagnosis or of the efficacy of the treatments prescribed (48 C. J. 1119, 1120), but he is required to exercise the degree of skill and learning ordinarily possessed and exercised under similar circumstances by the members of his profession in good standing and to use ordinary and reasonable care and diligence and his best judgment in the application of his skill to the case. (48 C. J. 1113.) Negligence cannot be presumed from the mere failure to obtain the best results. (*Paulich v. Nipple,* 104 Kan. 801, 180 Pac. 771.) To establish liability there must be competent testimony that there was lack of care or that approved procedure and methods were not followed, and the general rule is that the negligence in the treatment which is claimed caused the injury must be shown by medical witnesses called as experts, that it must come from those qualified by education, training and experience to give it. (*Saylor v. Brady,* 114 Kan. 764, 220 Pac. 1047; *Paulich v. Nipple,* supra, following *Sly v. Powell,* 87 Kan. 142, 123 Pac. 881; *James v. Grigsby,* 114 Kan. 627, 220 Pac. 267; *Pettigrew v. Lewis,* 46 Kan. 78, 81, and authorities there cited; *Tefft v. Wilcox,* 6 Kan. 46, 59.)

This does not mean, however, that there may not be certain facts concerning which persons not medical experts are permitted to testify. This court has said in numerous cases that the general rule

applies only to such matters as are clearly within the domain of medical science, and that matters that are within the common knowledge of mankind may be testified to by anyone familiar with the facts. (*McMillen v. Foncannon*, 127 Kan. 573, 274 Pac. 237; *Stockham v. Hall*, 145 Kan. 291, 65 P. 2d 348; *Flentie v. Townsend*, 139 Kan. 82, 30 P. 2d 132; *Yard v. Gibbons*, 95 Kan. 802, 149 Pac. 422; *Stecher v. London Guarantee & Accident Co.*, 133 Kan. 89, 298 Pac. 754.) Concerning medical testimony it is a general rule that a member of one school of medicine is not permitted to testify as to whether a defendant belonging to another school of medicine has employed the approved procedure and treatments of his own school. This rule, however, has been modified by many courts to the extent that where the two schools teach and practice the same methods of diagnosis or treatment in connection with the particular ailments or branch of medicine involved in the case, testimony may be received from a practitioner who does not belong to the same general school as that of the defendant. (21 R. C. L. 383; *Yard v. Gibbons*, supra.)

Professional testimony is of primary concern on this review, but summary of other testimony will be given insofar as at all pertinent, as background or otherwise, to the issue before us.

The plaintiff, Thelma Riggs, testified, in substance, as follows:

Five or six months before the operation was performed by Doctor Gouldner she (then Mrs. Charles Green) gave birth to a full-term dead child. Subsequently she was treated for some weeks by Dr. E. C. Rainey, who then accompanied her and her mother for a consultation with Doctor Gouldner. Doctor Rainey told Doctor Gouldner what had happened and all about it. He explained the matter fully and the things which he had done. Doctor Rainey had previously taken her temperature, her blood pressure and examined the condition of her abdomen. He told Doctor Gouldner that the plaintiff was running a temperature. She described her symptoms to Doctor Gouldner, telling him, among other things, that she had been having pain in her left side. There was a pressure there when she stood on her feet which made her sick and caused her to vomit. Doctor Gouldner did not take her temperature nor her blood pressure, but did test her pulse. He placed her upon the table and made an examination of her abdomen, both externally and internally, through the vagina. She said that Doctor Gouldner made a thorough examination, that he found some kind of a lump in her abdo-

men and she explained that was where she had been having pain; that she had then been having this continuous pain in her side for about three weeks. After this first examination Doctor Gouldner told her that the tumor was about the size of a small grapefruit and that he would not know what it would be until he operated. This first consultation was in the latter part of August, 1936. An operation was performed on September 7. A few hours afterward she talked to Doctor Gouldner and asked him what he did, and he said he could not do a great deal because it was impossible to operate and take the growth out and that she would have to recover from the shock and then they would try to do something else. Three or four weeks later Doctor Gouldner asked her how she was feeling, and she told him she was in about the same condition she was before the operation, and he said they would have to make arrangements for X-ray treatments and told her that he would make reservation for her at the hospital and for her to go there and take the treatments. These treatments were administered by Doctor Hagan. Later on peritonitis developed and she went back to the hospital and said that she did not have another conversation with Doctor Gouldner until that time. An operation was performed by Doctor Wolfe. She said that Doctor Gouldner told her father and mother to take her down the hall and Doctor Wolfe would operate, as he was on another case. She testified that Doctor Gouldner stopped in to see her a number of times, taking her pulse and looking at her chart at the head of her bed. After about ten days at the hospital for this second operation she went to her mother's home and did not see Doctor Gouldner after that, as far as she could remember. She said that Doctor Mermis then came on the case and she was taken back to the hospital in January, 1937, for treatments and operation of some sort in connection with a bowel trouble which had developed.

Florence Riggs, mother of the plaintiff, testified at length, but we need only give brief summary of pertinent parts of her testimony. She testified that her daughter had been attended by Doctor Rainey and she talked to Doctor Gouldner in the presence of her daughter and Doctor Rainey. At the time Doctor Gouldner made the examination he said there was a tumor on the ovary as nearly as he could tell without an operation, but he did not make a blood count at that time nor take an X-ray picture. He did not take her temperature, but she told him her daughter was running a temperature. She also testified that Doctor Rainey gave Doctor Gouldner

information concerning what he had done. She was in the observation room adjoining the operating room when the operation was performed and saw Doctor Gouldner take out two pieces of the tumor. Following the operation Doctor Gouldner told her that her daughter had a sarcoma and had but a few months to live; that about three days later she talked to him again after he had a report from the laboratory, and he said that the report did not positively show sarcoma, but he knew it was sarcoma; that sometime later she went to Doctor Gouldner's office, and he told her that X-ray treatments should be taken to retard the growth, and that Doctor Hagan would give them and he would call him and direct what kind of treatments she was to have; that her daughter asked Doctor Gouldner if the treatments would have any effect upon her bearing children and he said they would not, but that he was just trying to retard the growth. Subsequently, and just before Thelma was taken to the hospital for peritonitis in December, she called Doctor Gouldner, and he said he couldn't come as he had an operative case in the morning, and said he would send another doctor, and later Doctor Mermis came and said he was the doctor sent by Doctor Gouldner. Doctor Mermis continued to take care of Thelma until February 20. She said that when Doctor Mermis would call she would hear him call Doctor Gouldner on the phone to report on Thelma's condition and that following such conversation Doctor Mermis directed her to give morphine to Thelma by the use of a hypodermic. She also testified as to other drugs that were prescribed. When Thelma developed a serious bowel condition she heard Doctor Mermis talk to Doctor Gouldner over the telephone, after which Doctor Mermis ordered Thelma taken to the hospital. When they got to the hospital Doctor Gouldner looked at her and said that Doctor Wolfe would take care of her, as he was operating. Doctor Gouldner was not present during the operation, but he was there subsequently and looked at the charts and counted her pulse and respiration. She had a conversation with Doctor Gouldner in December, 1936, with reference to Doctor Mermis, and said she was satisfied with Doctor Mermis and, as far as they knew, he was doing all right. Doctor Gouldner said he thought it would be all right and that Doctor Mermis had more time to take care of Thelma than he had, but that he would come any time he was needed, day or night, and see that things were going right and check up and see that Doctor Mermis was following his instructions. At no time

from September, 1936, until March, 1937, did Doctor Gouldner tell her or tell Thelma in her presence that he had withdrawn from the case; that after Thelma was taken back from the hospital on the 21st day of February she called Dr. H. C. Wallace at the Southwestern Osteopathic Hospital, and Doctor Wallace came about four o'clock in the afternoon and then went back to the hospital and sent his son, Dr. John H. Wallace.

T. B. Riggs, father of the plaintiff, testified—in addition to some of the same matters covered by his wife's testimony—that Doctor Mermis called Doctor Gouldner over the phone almost daily during the time he was treating Thelma, that he (Mermis) talked to Doctor Gouldner about the absence of any bowel movements and reported that the sarcoma was growing at such a rapid rate that it had completely shut off the colon. On February 20, 1937, he (the witness) called Doctor Gouldner to see whether Thelma could be taken to the hospital again; that Doctor Gouldner sent Thelma a statement for $200 after this operation and they had received no bill prior to that time; that he did not remember whether Doctor Gouldner told him that Doctor Helwig had called the tumor a cellular neurofibroma.

The St. Francis Hospital "operative record" was introduced and showed that Doctor Gouldner's preoperative diagnosis had been "tubo-ovarian abscess" and his postoperative diagnosis "Retroperitoneal sarcoma. Adhesions to iliac vessels, ureter, etc., are so dense as to make removal impossible." The report of Doctor Hellwig on his laboratory examination of the tissue was also introduced, in which he gave as his pathological diagnosis "cellular neurofibroma." It is not denied that "cellular neurofibroma" is one kind of cancer.

Doctor Tedrick, a roentgenologist, or X-ray specialist, testified that he made X-ray pictures of the plaintiff on March 8, 1937— about six months after the first operation. He said that from experience in viewing conditions of sarcoma by X ray he could tell whether there is evidence of sarcoma if it is of sufficient density and whether there is evidence of ordinary tumor. Concerning the radiograph used in presenting his testimony, he said:

"I do not see any evidence to be sarcoma at this time. If there had been one before the plaintiff had received this course of X-ray treatments, it is possible that it would have disappeared and I couldn't see it here."

He said he was of the osteopathic school of medicine, but was a specialist in diagnosis and radiology and that the "authoritative

technic in the use of X ray in the allopathic and osteopathic schools are the same." He testified as to various approved methods in the vicinity of Wichita in the diagnosis of sarcoma, the principal ones being by X-ray pictures and the use of the stereograph, physical diagnosis and laboratory diagnosis. He said an X-ray diagnosis furnishes presumptive evidence of sarcoma. He testified that the presence or absence of fever would have no bearing upon the presence of sarcoma "in that location," but would be more indicative of an abscess. As to approved clinical laboratory methods, he said:

"Clinical laboratory methods include microscopic studies of the secretions and the tissues of the body, and in the study of sarcoma we would make our study from a section or a small piece taken from that growth properly prepared and placed under a microscope and diagnosed or interpreted by one skilled in those methods, and *that is the most important method of diagnosing of cancers or malignancies.*"

As to X-ray treatments he testified:

"The tendency of the X-ray treatment is to stop the activity of those cells, thereby stopping the growth."

Dr. H. C. Wallace testified that he was an osteopathic physician and surgeon and had been practicing about twenty-five years, that he had been surgeon at the osteopathic hospital in Wichita since 1924; was chief of staff there, and had had experience in diagnosing sarcoma, having had forty or fifty cases of sarcoma, which is one form of cancer. He testified that practically all the textbooks in the osteopathic school on diagnosing symptoms are written by allopathic physicians and that the approved methods of diagnosing tumors, malignant or nonmalignant, are "history, physical examination, pathological examination of tissue; X ray sometimes is of value, and laboratory tests are of some value." He testified that nothing "is definite or positive except the pathological examination." In answer to a hypothetical question bearing upon the symptoms and the physical findings at the time the operation was performed, he said, "I would say that a growth of that kind that is inoperable, of course is always suspicious of a sarcoma." He further testified:

"The approved method of procedure and diagnosis of tumors in the city of Wichita and similar communities at the time, was to make a diagnosis from the standpoint of the growth. If a biopsy is necessary, of course we don't do that until after we have exhausted other methods. *If there is a question as to malignant condition, we advise a biopsy.* In a case like this you have to go into the abdomen to get a piece of the tissue and by taking a biopsy there is a possibility it might increase the activity of the growth.

"The approved methods used at this time in Wichita before performing a

biopsy is to take the history, the physical examination; sometimes X ray is used if there is a possibility it may give us information; blood examination to determine if there is anemia or other evidence of malignancy. A blood count would not tell you whether it was a malignancy, it would tell you whether or not there is anemia present, which is present in malignancy, and may be present in many other conditions. A blood count would indicate whether or not there was an abscess, and pain and palpation usually indicates inflammation. Usually there isn't much·pain with sarcoma to palpation. From my examination of her and treatment, I have no positive evidence as to whether she did or did not have sarcoma. At the time of my examination I did not find any evidence of a sarcoma. I could not tell by looking at her whether or not she had ever had sarcoma. An X ray taken in March of 1937 might have shown the outline of a mass, it wouldn't show whether it was sarcoma or not."

Dr. John H. Wallace testified that he was a graduate of the Kansas City College of Osteopathy and Surgery and had been practicing for five years. It is upon his testimony that the appellee relies to support the contention that sufficient evidence of malpractice was shown to require submission of the case to the jury. He testified at some length, but we shall quote only portions pertinent to the immediate issue before us. The issue here is not whether some other doctor, allopathic or osteopathic, might think that Doctor Gouldner's preoperative diagnosis was not well founded, or that other methods of diagnosis or other treatment would have been better. The question is whether there was substantial professional showing that Doctor Gouldner's method of diagnosis was not an approved method, generally so recognized ·by the medical profession in and around Wichita, or that the use of X ray following his own diagnosis and the report of the pathological examination of the tissues was not an approved treatment, or that he was guilty of negligence in connection with the case. In determining the issue before us every reasonable inference favorable to the plaintiff must be indulged in connection with the evidence presented in her behalf.

It may fairly be said that the principal contention made by Dr. John H. Wallace, which he repeatedly emphasized, was that the plaintiff did not have a sarcoma and was not suffering from sarcoma prior to the operation performed by Doctor Gouldner. He criticised the procedural methods used by the defendant before advising an operation, claiming that all probability of the existence of a nonmalignancy should have been eliminated by the use of various methods, which he outlined, before performing an operation. But the insufficiency of that testimony, on the issue here, is that Doctor Gouldner did not diagnose the trouble as a malignancy prior to the

operation. On the contrary, his diagnosis was that the patient had an abscess. Doctor Wallace says she did not have a sarcoma and Doctor Gouldner came to the same conclusion, even though he didn't use all the tests which Doctor Wallace thinks he should have used to eliminate the probability of nonmalignancy. Moreover, it must be noted that the plaintiff's evidence shows that Doctor Rainey, who had been treating the plaintiff for several weeks, reported fully to Doctor Gouldner on the patient's case—the previous history, the symptoms and the treatment. There is no allegation that Doctor Rainey was not a physician of good standing or that Doctor Gouldner was not justified in accepting his report.

Again, Doctor Wallace laid some stress upon the pain testified to by the plaintiff, and contended that under other facts existing pain indicated abscess rather than malignancy. He testified:

"Ordinarily, a malignancy does not produce pain until it is large enough to be discovered by ordinary means of diagnosis—just by vision.

"Q. How large, about? A. Oh, sometimes it doesn't produce pain until they are as large as your head.

"Q. State whether or not a sarcoma the size of a small grapefruit would be painful to palpation on diagnosis. A. No.

"Q. All right. Go on tell the jury the other— A. The history was an abscess. The clinical course was an abscess.

"Q. The what? A. Clinical.

"Q. Tell them why it was an abscess, in your opinion. A. She acted like it. What I mean by that is the complaint of pain in her side on motion. A malignancy does not produce pain unless it gets large enough and heavy enough it causes weight; then it produces weight—or until it metastasizes."

On cross-examination he testified:

"Q. Doctor, I believe you said this morning that one thing that would influence you in determining whether or not this was an abscess or a sarcoma would be the length of time that she had been troubled with that situation? A. Yes, sir.

"Q. *Did you understand in making your answer that she had been troubled for some six months with some pain and suffering? A. Yes, sir.*

"Q. Was that correct? A. Yes, sir.

"Q. *Then if she had only been suffering about three weeks at the time she went to Doctor Gouldner, that might make some difference if that statement was correct, wouldn't it?* A. The way I understand the history of the thing was—

"Q. Just answer my question. A. State your question again, please.

"Q. *If she had only been suffering three weeks from this pain* in her left side in this condition prior to the time she went to Doctor Gouldner, *that would make some little difference? A. Yes; sure it would.*

"Q. Didn't you hear her testify here on the witness stand? A. I don't remember what she testified to, but the history was different."

It will thus be seen that Doctor Wallace based his testimony on this point, in part at least, upon the assumption that the patient had been troubled with pain and suffering for six months and that it would have made a difference to him, in making diagnosis, if she had been suffering pain for only three weeks, as the witness testified. But the appellee argues that this part of Doctor Wallace's testimony was modified on reëxamination, as follows:

"Q. Doctor, I asked you on my examination, in your various opinions here concerning this testimony, that you base your opinions only on the history given by her from the witness stand as she related it to Doctor Gouldner and from your experience in treating her and observing her personally. Now, state whether or not your testimony heretofore has been based only on that. A. Only on what? The testimony? From my experience?

"Mr. Sowers: Read it, please.

(Question read by reporter):

"A. That is what I based it on. My attempt to base it that way."

Whether the answer "That is what I based it on. *My attempt to base it that way*" is sufficiently definite to change the character of his former testimony that he predicated his answers in part on what he had been told about the history of the case, rather than wholly upon the testimony, may well be questioned. But this point need not be pressed.

We find no evidence to support an allegation that proper care was not taken in making the tentative diagnosis, or that the recommendation of an operation after such diagnosis constituted malpractice, or that the operation was not performed in an efficient and professional manner.

The only substantial question remaining relates to the use of X ray and its alleged harmful effect. Is there any evidence on that question to support an allegation of malpractice?

When the operation was performed Doctor Gouldner found that the growth was in such a position that it could not be removed, and no attack is here made upon that conclusion. He took two specimens of the tissue for pathological examination. The diagnosis of Doctor Hellwig, the pathologist, after making the examination was "cellular neurofibroma." This procedure, called a "biopsy," was not attacked, nor was it contended that Doctor Hellwig was not a qualified pathologist. None of the witnesses for the plaintiff contended that a biopsy is not an approved method of determining

whether a growth is a malignancy or a nonmalignancy. Doctor Tedrick, for the plaintiff, testified that "it is the most important method of diagnosing malignancy." Dr. H. C. Wallace testified that if there is a question as to whether the growth is of a malignant character "we advise a biopsy." Dr. John H. Wallace testified:

"Q. One of the recognized rules of procedure here in Wichita and vicinity similar is that after a surgeon goes in and finds a tumor there, *he should take a biopsy?* A. *Yes, sir.*

"Q. A piece of that, or two pieces, and deliver them over to the pathologist? A. *In case of suspected malignancy, yes.*

. . . . . . . . . . .

"Q. *After you opened up the abdomen and went in and found this tumor, that would be the proper method to pursue?* A. *Sure."* (Italics ours.)

Plaintiff's evidence certainly does not tend to support any allegation that the employment of biopsy, or reliance placed in laboratory diagnosis of malignancy, constituted malpractice. On the contrary, it might be urged that he would have been guilty of malpractice if he had not had such microscopic examination made and given weight to the report.

Doctor Gouldner's own postoperative diagnosis being that the plaintiff had a malignant growth, and that it was inoperable, and the microscopic test confirming the diagnosis, is there any testimony here that the use of X-ray treatments constituted malpractice? We find none. Plaintiff's witnesses testified to the contrary. Doctor Tedrick testified:

"If there had been one (sarcoma) before the plaintiff had received this course of X-ray treatments, it is possible that it would have disappeared and I couldn't see it here."

He also testified, as heretofore noted, that the tendency of X-ray treatments is to stop the activities and growth of malignant cells.

Dr. H. C. Wallace testified:

"X ray is used quite frequently to treat sarcoma, and there is always some destruction of normal tissues when deep therapy is given."

There was no medical testimony tending to show any malpractice on the part of Doctor Gouldner in connection with the later operation or treatments given the plaintiff.

The appellant contends that neither Dr. H. C. Wallace nor Dr. John H. Wallace, being osteopathic physicians, was competent to testify concerning the procedure or methods used in making diagnosis or concerning the treatment prescribed by Doctor Gouldner, a physician of the allopathic school. The general rule on this ques-

tion was stated earlier in this opinion. There may be doubt whether the facts here bring the case within the qualification of the rule and make the testimony competent. As to diagnosis, that doubt has been here resolved in favor of the plaintiff because there was testimony that for instruction in diagnosis of tumors, malignant and nonmalignant, the schools of osteopathy have generally used textbooks written by allopathic doctors, and that substantially the same methods of diagnosis are used by the two schools.

Cases cited by appellee wherein the evidence was held sufficient to withstand demurrer have been examined. Based on divergent facts, they are not disturbing to the conclusion reached on the record before us.

In our opinion there is no evidence in this case which would have supported a finding that the defendant had been guilty of malpractice, and we find that the trial court erred in overruling the demurrer to plaintiff's evidence and in overruling defendant's motions for a directed verdict, and for judgment on the record.

The cause is remanded with directions to enter judgment for the defendant.