Irvin L. DURFLINGER, individually and as next of kin of Raymond Durflinger and Ronald Durflinger, Plaintiffs,

v.

Benjamin ARTILES, et al., Defendants.

Civ. A. No. 75–63–C6.

United States District Court,
D. Kansas.

June 12, 1981.

Lee Turner of Turner & Hensley, Great Bend, Kan., for plaintiffs.

Bruce E. Miller, Deputy Atty. Gen., Topeka, Kan., for Preciosa Rosales, Eduardo Medrano and Terry Keeley.

Reid Stacey, Asst. Atty. Gen., Topeka, Kan., for Benjamin Artiles.

Hal E. DesJardins, Bruce A. Roby, Legal Div., State Dept. of Social and Rehabilitation Services, Topeka, Kan., Jerry Ward of Hampton & Ward, Great Bend, Kan., Glee Smith, Jr., of Smith & Burnett, Larned, Kan., for George W. Getz, Eduardo Medrano and Artiles.

### ORDER OVERRULING DEFENDANTS' MOTION FOR NEW TRIAL AND SUSTAINING MOTION FOR AMENDED JUDGMENT

THEIS, Chief Judge.

There is presently pending before the Court in this case defendants' motions for a new trial and to amend judgment, filed following a jury verdict for plaintiffs in the amount of $92,300, and entry of judgment by the Court. A discussion of the evidentiary basis and the contentions of counsel is necessary for disposition of these post-trial motions.

On April 25, 1974, Bradley Durflinger lay in wait in the family room of his parents' home in Salem, Oregon, and when his mother, Margaret Durflinger, came in, he shot her dead. He dragged her body to the back of the house, reloaded, and waited. When his brother Corwin came in, he shot him too. Bradley chased Corwin to the back of the house and emptied the clip into Corwin, killing him as well.

This is a wrongful death action brought by Irvin Durflinger, husband of Margaret and father of Corwin and Bradley, on behalf of himself and his two surviving sons, Raymond and Ronald, against five physicians who participated in the decision to discharge Bradley Durflinger from the Larned State Hospital on April 19, 1974. Bradley had been a patient at Larned State Hospital pursuant to civil commitment by the Probate Court of Reno County, Kansas.

Testimony at the trial indicated Bradley Durflinger was a misfit as a child, a bed-wetter, sickly, and a loner. He did not participate in social activities to the extent his brothers did, nor was he as good a student. He had run away from home occasionally as a teenager, returning to his grandparents' home in Hutchinson, Kansas.

It was during one of his returns to Hutchinson that Bradley had been committed to the hospital. Arriving home from a trip to Topeka, Kansas, Christmas night, 1973, Bradley's maternal grandparents, Mr. and Mrs. Elliott, discovered Bradley hiding behind the kitchen door, poised with a meat fork in one hand and a hatchet in the other. He also had a gun from the house leaning in the corner behind the door, but there were no shells in the house. He told his grandparents he had planned to "knock them off and take the Toyota." He had packed boxes and suitcases full of items from the house which he was going to take along and sell to raise some money.

In his videotaped statement to the Salem, Oregon police after the killings, Bradley described how he had found the rifle under his mother's bed and the shells in his father's drawer, and how he waited to shoot his mother and then dragged her off and returned to wait for "whoever came along next." He stated it was time for him to leave again because it was not going to work. He said, "I needed to leave again. The only way I could do it was with the car and my mother had the keys. It's the same thing that happened down in Kansas." Asked if he had ever done anything like this before, he said, "I almost did." When? "Christmas night in '73, my grandparents' house in Hutchinson, Kansas." Pl.Ex. 8. Bradley told the police he would like to go back to Larned State Hospital since his girl friend was there. Def.Ex. A.

Between "almost" in 1973, and the acts of 1974, was Bradley's stay at Larned State Hospital. The Reno County Probate Court found Bradley a mentally ill person, potentially dangerous to himself and others, as then defined by 1965 Session Laws, ch. 348, § 2(1), and as a person mentally impaired, viz.:

"to the extent he is in need of 'care or treatment' and who is or probably will become dangerous to himself or the person or property of others if not given 'care or treatment.' "

The paper work needed to execute a transfer for Bradley to a hospital in Salem, Oregon, where his parents lived, was begun, and the evidence indicates that Bradley's family and his treatment team at Larned State Hospital, all expected Bradley would be transferred. This suddenly changed when a note was sent by defendant Dr. Benjamin Artiles, Clinical Director, to Dr. Francisco Izaguirre, leader of the treatment team, as follows:

"Izaguirre,

Would the team please reconsider this case.

I do not understand why we should assume the responsibilities & expenses of a transfer all the way to Oregon of some one [sic] who is 19, physically healthy and suffers from a character disorder and who furthermore is not motivated for treatment.

It rather looks to me that we should discharge this patient." Pl.Ex. 10.

At this point, plans to transfer Bradley were halted, and soon his discharge was arranged.

Dr. Artiles, according to his deposition which was read at trial, never met Bradley. He knew he had been diagnosed as a socio-path with anti-social features, and that that meant he was dangerous to the community at large. He felt people like Bradley were a law enforcement problem, and that county attorneys and judges pass the buck to the hospitals, which cannot do anything about it, rather than take the necessary action to control a person who is dangerous. Dep. at 15–16. He was concerned by the expense of the transfer to Oregon, and "because that transfer implied taking two of the most valuable aides in the hospital, male aides, always at a premium, to go out to Oregon to take this person." Dep. at 19–20. Dr. Artiles testified he knew if Bradley were discharged he could be dan-

gerous to society and that sociopaths quite often strike and kill those to whom they are closest. Dep. at 21.

The Court's independent questioning of Dr. Artiles and other expert witness evidence in the case disclosed that there actually is no known cause for the type of mental illness afflicting Bradley Durflinger. Nor is there any scientific testing method for ascertainment that the illness has ceased. The principal treatment seems to be with tranquillizing drugs, vocational rehabilitation, and group counseling. Boiled down, it was admitted by the psychiatric experts that an opinion that the dangerous mental disorder had dissipated could not be made with medical or scientific certainty.

In contrast to Dr. Artiles' assertion that Bradley was not motivated for treatment, the trial testimony of the members of the treatment team was that the decision to release Bradley was made because he was doing so well. Defendant Dr. Preciosa Rosales, the ward physician, testified that Bradley's discharge would have therapeutic value. She was asked what Bradley did that led either her or the team to think Bradley had improved. She stated he was regularly attending his assigned activities. This was followed by a long pause. Plaintiff's counsel inquired, "What else?" "He was, ah," she paused again, "hmm, I'm trying to think." She then noted Bradley had a girl friend for the first time in his life at the hospital. Those were the only two indications she could offer. Bradley's hospital record indicated he had been referred to vocational rehabilitation by the staff, and it was his refusal to participate which had triggered proceedings to transfer him to Oregon. Pl.Ex. 2.

Dr. Artiles was clinical director at Larned State Hospital, and a psychiatrist. He testified at his deposition he was not a Freudian, but a member of the dynamic school, and classified himself as an eclectic. Dep. at 5, 54.

Dr. Rosales was a ward physician. Her deposition, read at trial, indicated she had no special training in psychiatry or psychology. Bradley's hospital record indicated

Dr. Rosales conducted Bradley's admission examination, including his psychiatric evaluation. She also prepared his discharge summary, including psychiatric evaluation. Pl.Ex. 8.

Dr. Medrano was also a ward physician, and participated in team decisions regarding Bradley, including the decision to discharge him. Dr. Medrano testified in his deposition, also read at trial, that he did not have psychiatric training except that obtained during his employment at Larned State Hospital, which began in June, 1973. Dep. at 5–7.

Dr. George Getz was the superintendent of Larned State Hospital. His testimony was that as clinical director Dr. Artiles had the authority to accept or reject the transfer. He also indicated that if the members of the treatment team had disagreed with the order or recommendation (whichever they might have regarded it to be) contained in Dr. Artiles' memo to Dr. Izaguirre, they could have disregarded the recommendation, or appealed the order to Dr. Getz.

Defendants urge several grounds they allege justify a new trial. They contend since they consistently claimed a defense of contributory negligence, they should have been allowed to present it at trial. They argue it was the family which made Bradley sick in the first instance, and that they were prevented from proving that to the jury. They also argue the family somehow failed to convey this same information to the hospital and that this made them contributorily negligent.

Defendants were allowed to make a proffer of their contributory negligence evidence. It did not include any evidence on how a person becomes a passive aggressive personality with sociopathic features. It did include such information as the fact that Bradley would testify he hated his parents because they would not allow him to sleep late on Saturdays, that he felt no one in his family loved him, or had ever touched him in a loving way. He would also have reportedly testified that he felt

rebellious after his return to Oregon before he killed his mother and brother because his father made him get a job and get a haircut and a shave.

Assuming, arguendo, that Bradley was a passive aggressive with sociopathic features, as diagnosed at Larned, because of his childhood with the rest of his family, that would not mean that that was contributory negligence in this case. The issue here is, given the fact Bradley was what and who he was in April of 1974, coupled with the hospital's records, and for whatever reason, whether the defendants acted in a negligent manner in reaching the decision to discharge Bradley. If, in fact, Bradley's condition was caused or aggravated by the family, which the Court again emphasizes was not shown by testimony or by proffer, that would seem all the more reason to not discharge Bradley to the family's custody and care.

The hospital record, and the testimony at trial, both indicate there was communication between the family and the hospital, and no evidence was presented or proffered by defendants that any facts they learned about Bradley's history since his discharge would have changed in any way the decision to discharge Bradley, or his course of treatment. Any information Bradley could have offered at trial about how his family history made him sick, or dangerous, was available through him to the hospital while he was a patient there, and would have been highly relevant to his psychological diagnosis and treatment. The hospital record indicates Bradley's family situation was discussed during his treatment at Larned State Hospital.

It is incredible to suggest Bradley's parents were contributorily negligent in taking Bradley to the barbershop and in helping him find employment. The defendants and the hospital had indicated Bradley no longer needed to be hospitalized. The hospital notified the Probate Court of Reno County, Kansas, which had committed Bradley to Larned, that Bradley was discharged "since (he she) is no longer in need of care or treatment." Pl.Ex. 1, 8. If the doctors who had been treating Bradley thought he was well enough to be released, it strains credulity to suggest the family was really the ones who were negligent to not do something about Bradley before he killed, or that they should not be entitled to rely upon the representation Bradley belonged in an environment outside the hospital. Perhaps if some time had passed between Bradley's discharge and the killings, and if he had shown signs of his continued dangerousness, and the family had failed to take any steps to get some treatment for Bradley, the contributory negligence issue might have been in the case. In fact, Bradley had been in Oregon only three days when he killed his mother and brother.

Defendants claim they were prevented from calling Bradley as a witness, and that they were therefore unable to attack the credibility of the family members or show what really happened after Bradley was released from Larned. Mrs. Elliott characterized the Durflinger/Elliott family relationship as a close one. The gist of defendants' proffer did not undermine that characterization. As the Court pointed out several times, a family could fight like cats and dogs and still be a close family. The Court did not, however, exclude Bradley as a witness. The Court's ruling was that testimony on contributory negligence would not be allowed, and stated:

> "If he's going to testify in any other areas than that then, why, I have no proscription on that at this time. But as I said, I can't imagine what he could— what use he contributes to the case." (Chambers conference, Feb. 26, 1981.)

The Court gave defendants' counsel every opportunity to propose some other area on which she wished Bradley to testify, other than contributory negligence.

Defendants claim they were not allowed to call Dr. George Dyck as a witness. Dr. Dyck was originally retained by plaintiffs as an expert. He was listed as a witness at one point, because plaintiffs were uncertain which experts they would use at a time when a witness list was due. He was later returned to the status of expert retained,

not expected to testify, and removed from the witness list. By then the defendants had incorporated the plaintiffs' list by reference, and it was their contention he was therefore listed as a witness on their list, even if no longer on plaintiffs' list. Plaintiffs were understandably upset to learn that an expert they had retained had then been hired by defendants. (They also apparently learned only in Dr. Dyck's final report that he was a consultant to Larned State Hospital.)

■ The conduct of the Kansas Attorney General's office and Dr. Dyck did not violate Rule 26 of the Federal Rules of Civil Procedure. Rule 26 merely protects the identity of experts from discovery, and does not prohibit conversation with persons whose identity is known if they are willing to communicate. In *Ager v. Jane C. Stormont Hospital and Training School for Nurses,* 622 F.2d 496 (10th Cir.1980), the Court examined the policy reasons why exceptional circumstances must be shown before an adverse party is entitled to discover the identity of non-witness experts. These included the possibility of the expert being contacted and revealing non-discoverable materials, the danger the opponent might try to compel such an expert to testify at trial, and the fact such disclosure "would inevitably lessen the number of candid opinions available as well as the number of consultants willing to even discuss a potential malpractice claim with counsel." *Id.* at 503. These same policy reasons might be advanced as a reason to disqualify a witness who had been a non-witness consultant for the other side. Parties might also be deterred from consulting experts during discovery if these experts were likely to later become adverse witnesses. On the other hand, a party could reduce the number of witnesses available to their opponent by consulting them and making them ineligible. There is, however, no such disqualification under the rules.

The Court did not exclude Dr. Dyck as a witness. Unfortunately, this dispute was resolved in chambers at a time when the court reporter was not present. It is the Court's recollection, and that of two of his law clerks, who were present, that the Court stated that he could not exclude Dr. Dyck. He did, however, point out the conflict of interest situation in which Dr. Dyck would be placed, and that cross-examination would be allowed in that area, as well as the area of inconsistencies between his preliminary report and final report to plaintiffs. Plaintiffs' counsel also stated he would pursue an ethical complaint against Dr. Dyck if he testified. Counsel for defendants stated at that point that Dr. Dyck would not be called. It was for this reason no proffer was ever made of Dr. Dyck's testimony, and this Court does not know, even now, what Dr. Dyck's testimony would have been had counsel chosen to call him.

■ The deposition of Dr. Frederick Moe was read at trial. Dr. Moe is a psychiatrist and had once seen Bradley as a private patient. He was director of the Mental Health Institute when Bradley was referred there for evaluation during the 1973 commitment proceedings. His stamped signature appears on the report to the Probate Court of Reno County, Kansas. He had no independent recollection of Bradley, but had based his opinion about Bradley's mental malaise upon the basis of the report of psychological testing and interviews by a psychologist to whom Dr. Moe had referred the patient. Such evidence is validated by Rule 703 of the Federal Rules of Evidence. Defendants' objection that Dr. Moe was not qualified to testify about Bradley's evaluation in December of 1973, since he did not see him at that time is ironic indeed, since Dr. Artiles never saw Bradley at all, and made his recommendation of discharge relying on the same type of records Dr. Moe relied upon to make his recommendation to the Probate Court, and to refresh his recollection at his deposition. It was neither error, nor prejudicial, to allow the reading of Dr. Moe's testimony. This issue was dealt with at some length in the Court's Memorandum and Order of February 19, 1981, Docket Number 220.

According to the defendants, all evidence of Bradley's activities after his discharge

**328**

should have been excluded except the fact he killed his mother and brother, and that the videotape of Bradley's confession was irrelevant. The instruction given the jury before viewing the videotape, and reiterated in Instruction No. 12, made clear the relevance of the tape. Instruction No. 12 reads as follows:

"You were shown a videotape of the confession of Bradley Durflinger of the killing of his mother and brother. This exhibit should be considered by you as bearing only on certain issues in this case. The videotape has been offered to show that the killings giving rise to this lawsuit did occur. You may consider the tape as it bears on that issue. The videotape has been offered also to show that the state of mind and demeanor of Bradley Durflinger at and after the killings was similar to his previous state of mind and demeanor at the time of the threatened violent acts toward his grandparents. This videotape has been offered to show that Bradley did engage in the type of violent actions which the plaintiffs claim were foreseeable. You may consider the tape on the issue of whether Bradley did take actions which the plaintiffs claim were foreseeable.

"You are cautioned that this videotape was made after Bradley's release from the hospital. Obviously this tape and the events related thereon could not have been considered by the defendant doctors when they decided to release Bradley. Therefore, these events which transpired after Bradley's release should not be considered by you when you decide whether the defendant doctors could or should have foreseen that Bradley might engage in this specific violent behavior."

This issue is also dealt with in the February 19th order.

■ The references to famous killers, objected to by defendants, came in the course of discussions of the literature with doctors involved in this case, or testifying as experts, as did the discussions of psychotic and neurotic behavior. Discussion of psychotic and neurotic behavior were in the context of understanding the evolving vocabulary of the body of psychological/psychiatric literature and knowledge. Defendants complain that the Court erred in refusing "to strike Dr. Artiles' deposition testimony relating to psychotic and sociopathic behavior even though such responses clearly addressed hypothetical questions and not specific ones dealing with Brad Durflinger." Motion for a New Trial, pages unnumbered. Besides the fact it was defense counsel who objected to only reading part of Dr. Artiles' deposition, rather than its entirety, this Court is aware of no authority, nor is any suggested, which precludes propounding hypothetical questions about psychiatric subjects within the expertise of psychiatrist defendants. The net effect of this evidence, according to defendants' memorandum, "armed plaintiffs with a colorful palette to paint Brad Durflinger in monster medium." *Id.* In point of fact, Brad Durflinger did his own painting. Defendants contend references to "Jack the Ripper" and the "Texas Tower sniper" were irrelevant, immaterial, misleading, confusing and highly prejudicial, since Bradley's diagnosis "was clearly established, his behavior documented and described." *Id.* As the memorandum correctly states, "Whether defendants knew or could have known Brad would act out violently was one of the important issues." *Id.* It was in this context plaintiffs elicited testimony his diagnosis was parallel to that attributed in psychological literature to those famous killers, and the issue to which such testimony was directly relevant.

The remaining grounds urged by defendants all concern the standard of care to which they should be held. They urge that the plaintiffs' expert witness should not have been allowed to testify, as he was unqualified; that the Court's instructions on the standard of care were in error; and that no evidence indicated the defendants had a duty to warn or to refuse to release or any negligence with regard to that duty.

■ Plaintiffs called Dr. William O'Connor, Ph.D., as an expert witness. Dr. O'Connor is a clinical psychologist. At the

time of trial he had a private practice and was, or had been, a member of the faculties of the University of Kansas and the University of Missouri School of Medicine. Dr. O'Connor was on the staff at Osawatomie State Hospital for seven years, and served as Chief Psychologist and Director of Research and Training. Osawatomie is another state mental hospital run by the State of Kansas, and Dr. O'Connor's uncontradicted testimony is that Larned and Osawatomie are generally similar hospitals. Dr. O'Connor testified he participated as a team member on a ward at Osawatomie which performed duties like those of the team on the ward where Bradley was a patient, the so-called Pinel team on which defendants served.

Defendants' position is Dr. O'Connor was not qualified to testify upon standard practice or duty of care of the defendants because he had no medical training, and he could not prescribe medication, give stitches, diagnose medical maladies, nor do surgery. They emphasize Dr. O'Connor is licensed to practice in Kansas by a different board than the defendant medical doctors. Therefore, according to defendants, Dr. O'Connor could not give an opinion as to what the usual and approved practice would be, nor as to the care or lack of care exercised by defendants.

The general rule on the requirement for expert medical testimony in medical malpractice actions was stated in *Riggs v. Gouldner*, 150 Kan. 727, 96 P.2d 694 (1939):

"To establish liability there must be competent testimony that there was lack of care or that approved procedure and methods were not followed, and the general rule is that the negligence in the treatment which is claimed caused the injury must be shown by medical witnesses called as experts, that it must come from those qualified by education, training and experience to give it. . . . Concerning medical testimony it is a general rule that a member of one school of medicine is not permitted to testify as to whether a defendant belonging to another school of medicine has employed the approved procedure and treatment of his own school. This rule, however, has been modified by many courts to the extent that where two schools teach and practice the same methods of diagnosis and treatment in connection with the particular ailment or branch of medicine involved in the case, testimony may be received from a practitioner who does not belong to the same general school as that of the defendant."

150 Kan. at 728–29, 96 P.2d 694 (citations omitted). Defendant Dr. Gouldner was a member of the allopathic school, while plaintiffs' experts were osteopathic physicians. The Court indicated he joined the many courts modifying the rule, and allowed the expert testimony, because on the topics in dispute the schools of osteopathy have generally used textbooks written by allopathic doctors, and because substantially the same methods of diagnosis are used by the two schools. *Id.* at 738, 96 P.2d 694.

In *Chandler v. Neosho Memorial Hospital*, 223 Kan. 1, 574 P.2d 136 (1977), the trial court excluded testimony offered by two physicians who were professors of pediatrics, one at the University of California at Los Angeles, and the other at the University of Illinois. The trial court held as a matter of law that there could not be a nationwide standard of care for the treatment of premature infants, that the standard must be different in Chanute and similar communities from elsewhere in the United States, and that since the witnesses had no experience in Chanute or a similar community, they could not be qualified to express their proffered opinions. In reversing, the Kansas Supreme Court indicated it was not correct to apply such a strict application of the locality rule. The Court pointed out the standard of medical and hospital care is not a legal question, but a matter for expert testimony.

"An expert may acquire knowledge of the applicable standard in the same manner that he acquires his other expert knowledge—through practical experience, formal training, reading, and study, or through a combination of those. . . . The witnesses here, well qualified medical ex-

perts, claimed knowledge of the applicable standards of care, and they gave a reasonable explanation as to how such knowledge was acquired."

*Id.* at 5, 574 P.2d 136 (citations omitted).

In *Moore v. Francisco,* 2 Kan.App.2d 526, 583 P.2d 391 (1978), the Court held it was error not to permit a witness who was an anesthesiologist to testify that the defendant surgeon was deficient in taking a medical history of plaintiffs' decedent. The anesthesiologist's proffered testimony indicated the taking of a personal history was a matter common to all areas of medicine throughout the United States, that he had knowledge of the standard, and that he could explain the source of his knowledge.

Defendants urge this Court to adopt the rule of *Dolan v. Galluzo,* 77 Ill.2d 279, 32 Ill.Dec. 900, 396 N.E.2d 13 (1979). The defendant, a podiatrist, had performed surgery on plaintiff, who alleged the operation was negligently performed and that plaintiff did not give an informed consent because he had not been informed of the possible complications of the operation. The court held that only a licensed podiatrist was competent to testify as to the standard of care of podiatrists or as to whether defendant had failed to inform plaintiff of foreseeable risks of the operation. The court also barred any testimony by any but a licensed podiatrist which would show podiatrists do not have an adequate standard of care or lack an adequate procedure of obtaining informed consent. As the dissent indicates, this opinion is so restrictive that even a professor in a school of podiatry who did not happen to be licensed to practice podiatry would not be able to testify as to the standards of care required of podiatrists. *Dolan* is not the law in Kansas, but rather is directly in conflict with the enlightened views of the Kansas Supreme Court which we must apply in this diversity action.

The decisions in question in this case were not medical decisions, but psychological ones. The testimony of both Dr. O'Connor and of defendants' expert, Dr. Howard Williams, a psychiatrist, was that there is but one body of knowledge common to the practice of psychology and psychiatry. Defendant Dr. Artiles, a psychiatrist, also testified that psychiatry and psychology overlap in their body of knowledge. Dr. Terry Keeley, Ed.D., was the psychologist on the Pinel team, and was a defendant in this action until settling with the plaintiffs shortly before trial. He participated in the decision to discharge Bradley. His testimony, too, was that psychologists were competent to make psychological diagnoses and to discuss the standard of care in making the decisions, and that the body of knowledge was a shared one. Dr. O'Connor possessed the knowledge and expertise to testify as to the standard of care which should be exercised in reaching a decision to discharge a patient in a mental hospital run by the State of Kansas, both by education and by experience. He claimed knowledge in this area, and gave a reasonable explanation of how such knowledge was acquired. It was not error to allow his testimony, whose weight was for jury determination, and indeed it might well have been an abuse of the Court's discretion to exclude his testimony.

■ Defendants presented a united defense, provided by the Kansas Attorney General, pursuant to a statutory duty to defend. Rather than provide independent counsel for each defendant by retaining outside attorneys for at least two of them, he sent one assistant attorney general to represent all three doctors who were active courtroom defendants. Defendant Dr. Terry Keeley, who had been an active defendant until his pretrial settlement, had been represented by his own personal counsel, Jerry Ward. Defendant Dr. Izaguirre was an unserved defendant. It is now argued that Drs. Medrano and Rosales should have been held to some other standard of care than Dr. Artiles. The Court determined from the evidence presented that Drs. Medrano and Rosales participated in the making of the psychological decisions. Dr. Rosales made the initial diagnosis. The testimony was that both doctors assumed equal responsibility with Dr. Keeley, the team

psychologist, in reaching the decision to discharge Bradley. If one accepts the contention that Dr. Artiles only made a suggestion, not an order, Drs. Medrano and Rosales could be viewed as the only defendants who actually participated in the decision to discharge. Defendants correctly state the jury evidenced some difficulty in the area of the standard of care and differentiating between the defendants' activities.

Instruction No. 10 stated:

"The duty of reasonable care required of the defendants is to exercise that degree of knowledge, skill, care and attention exercised by other individuals charged with the responsibility of making the decision whether or not to release mental patients from other mental institutions. This requires that the decision makers determine whether the mental patient is dangerous to others. A decision maker who should or can foresee that a potential victim or class of victims may be harmed by a patient is under a duty to control the conduct of the patient, or to warn the potential victim or victims.

"In judging the duty imposed on each of the defendants, two being medical doctors or physicians, and one having the medical specialty of psychiatry, it is not necessary that there be considered by you as jurors a different kind or degree of standard of care based on the extent of medical expertise of each. Two of the defendants, Rosales and Medrano, acted as expert members of the team in making the decision concerning the release of Bradley Durflinger. The third defendant, Dr. Artiles, acted as one supervising the decisions of the team and with administrative power to affect those decisions.

"You are instructed that you must judge whether the defendants acted with the degree of care required of them in knowing or foreseeing that a person having the mental characteristics which the hospital files disclosed, and those additional characteristics which the defendants knew about, would likely be dangerous upon release so as to inflict injury or death upon others.

"Stated differently, in making your decision as to negligent conduct and causation therefrom, you should consider that all defendants are held to the same standard or degree of care. However, your decision as to negligence must be made as to each individual defendant from all the facts and circumstances in the evidence."

During their deliberations, the jury sent the following inquiry to the Court:

"The jury would like clarification of instruction # 10, particularly paragraph [sic] # 2 and 4.

William R. Carey
Foreman."

In response, the Court further instructed:

"The Court has instructed you, in Instructions numbered 5, 6 and 7, that an individual under the circumstances of this case owes a duty of care to the plaintiffs and the plaintiffs' decedents. Instruction No. 10 was to help explain what that standard of care was. As stated in the first paragraph of that instruction, all the defendants were required to exercise care to the same extent that others in like circumstances use. That is, the defendants were required to take that care utilized by decision makers in other mental facilities when those other decision makers decide to release a patient.

"Paragraph 2 of Instruction No. 10 tells you that even though Dr. Artiles was a psychiatrist and Drs. Medrano and Rosales were medical doctors without formal education in psychiatry, the standard for judging their actions in releasing Bradley is the same. By this the Court means that because Medrano and Rosales have less education in the field of psychiatry, they are not to be judged by a lesser standard of conduct.

"The final paragraph of Instruction No. 10 was intended to indicate to you that each of the individual defendants in this case must independently be measured against this same standard of care. The individual actions or inactions of the three defendants must be weighed to determine if they conformed their actions to this standard of care."

**332**

The actions or inactions of the defendants were in evidence. There was evidence all the doctors undertook to participate in decision making to which that standard of care applied. If there was another, lesser standard of care than that indicated by the evidence which should have been applied to some of the decision makers, it was up to the defendants to provide expert testimony to rebut plaintiffs' evidence of the applicable standard.

There were obviously some arguments which could have been made to the jury concerning the conclusions to be drawn from the evidence as to the negligence or lack of negligence of the various individual defendants. It is possible that other evidence could have been elicited which would have tended to differentiate the positions of the individual defendants. It is clear that the choice of the defendants, or of the Kansas Attorney General, to present a joint defense, made this impossible. Counsel could not distance the defendants one from another without harming the case of one or another of her clients. This Court cannot grant a new trial because a choice of trial strategy proved unsuccessful.

■ Defendants contend, finally, that plaintiffs failed to establish a prima facie case, because there was no evidence indicating defendants had a duty to warn or to refuse to release, or that there was evidence of any negligence in regard to that duty.

The standard of care to be applied was defined in Instructions 6 through 9. Instruction No. 6 is Section 319, Restatement of Torts, Second (1965):

"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled, is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

Instructions 7, 8 and 9 are based upon *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976):

*Instruction No. 7*

"As a general principle of law, a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.

Such a general principal is applicable between a patient and his doctor, or psychotherapist.

Once such a doctor or therapist does in fact determine, or under applicable professional standard should have determined, that a patient poses serious danger of violence to others, such a therapist bears a duty to exercise reasonable care to protect the foreseeable victim or victims of that danger.

As stated in Instruction No. 10, for the purposes of this case all named defendants fit this category of doctors or therapists."

*Instruction No. 8*

"You are instructed that the roles of a psychiatrist, who is indeed a practitioner of medicine, and that of a psychologist, who performs an allied function, are like that of a physician who must conform the standards of the profession and who must often make diagnoses and predictions based upon such evaluations. Thus the judgment of a therapist in diagnosing emotional disorders and in predicting whether a patient presents a serious danger of violence is comparable to the judgment which doctors and professionals must regularly render under accepted rules of responsibility."

*Instruction No. 9*

"The law recognizes the difficulty that a therapist encounters in attempting to forecast whether a patient presents a serious danger of violence. Obviously, the rule of law does not require the therapist, in making that determination, to render a perfect performance; the therapist need only exercise that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of that professional specialty under similar circumstances."

These instructions made it clear the defendants were not insurers, and that what was required of them was the exercise of reasonable care. There were two important factual determinations which the jury had to make: whether it was predictable that Bradley was dangerous, and whether the defendants exercised reasonable care in the process of deciding Bradley should be released.

Dr. O'Connor testified as to how a practitioner would have evaluated Bradley's situation in 1974. He discussed the concept of lethality, which he defined as the probability of a harmful or lethal event occurring, in terms of dangerousness to self or others. He testified that a person with Bradley's diagnosis was at his or her best in the structured setting of a hospital, and could be expected to do less well in an unstructured setting where the person had to make decisions for his or herself, or had to deal with tension or conflict.

Dr. O'Connor identified six elements which he said should be examined to determine the lethality of a patient. First is the admitting complaint. He scored Bradley's lethality high here, since he was admitted after a lethal act or threat on his grandparents.

A patient's history is the second element. Dr. O'Connor examined Bradley's history as taken at Larned and in the report from the Reno County Social and Rehabilitation Services, which was part of the hospital record. He judged Bradley to be always marginal, with a history of repeated antisocial acts such as stealing, lying, running away, going AWOL in the service. There was, he testified, no good long term positive indications in Bradley's history.

Next, Dr. O'Connor looked at the diagnostic risk. Again, Bradley graded out poorly. A diagnosis of passive-aggressive was said to be a risky type person, which becomes more risky when antisocial features are added. Added to an apparent homicide attempt, one has strong signs of danger.

The fourth factor considered, according to Dr. O'Connor, is psychological test results. He analyzed the results of Bradley's Minnesota Multiphasic Personality Inventory (MMPI) test, administered on admission. Dr. O'Connor said the MMPI profile indicated moderate lethality, but that with a high depression scale and low score on the manic chart, indicated a tired, worn out, low energy person. He testified that one could expect depression to decrease and energy to rise during hospitalization, which would probably increase the indications of lethality. According to Dr. O'Connor, Bradley's MMPI results showed a need for further testing. The only other test administered to Bradley during his hospitalization was an incomplete sentence test, the results of which were not in his hospital record, and which Dr. O'Connor indicated was not a very informative test. When asked if he would discharge Bradley, based on his hospital record, without further testing, Dr. O'Connor responded that a fairly complete evaluation was indicated prior to discharge.

Element five is ward behavior. Taken alone, Dr. O'Connor testified, ward behavior is not very important, but he said one would hope to find indications of improvement. He testified he found nothing in ward behavior which proved additional lethality, but that there was nothing to indicate improvement, to dispel danger or improve the odds.

The final factor in measuring lethality, according to Dr. O'Connor, is effectiveness and appropriateness of treatment. He testified there is nothing known to be effective for a patient with Bradley's diagnosis except that long term psychotherapy might lead to some improvement. This had not been given to Bradley.

It was the opinion of Dr. O'Connor that Bradley was clearly a risk for a lethal act within a reasonably short time after discharge toward himself or a close friend or relative. He testified he would not have discharged Bradley. He also testified that a decision to discharge should, in any event, have been preceded by a mental status examination, a follow-up on the MMPI, and probably a battery of other tests, and a search for improvement justifying discharge.

334

Dr. O'Connor also criticized the way Bradley was discharged. The usual practice, according to him, is to have a discharge plan, and to at least consider some intermediate structure environment, since the amount of structure in the patient's environment determines whether he is likely to be violent. The doctor testified the usual practice would be to make a plan, to communicate with anyone who might be at risk, and tell them and the patient about the plan. Dr. O'Connor found no evidence in the record that any of this was done.

Dr. Howard Williams was called by defendants as an expert. He is a psychiatrist, employed by the Sedgwick County Department of Mental Health. He had experience at Topeka State Hospital, a sister institution to Larned and Osawatomie State Hospitals. Dr. Williams testified that it was very difficult or impossible to predict dangerousness. He also testified that from Bradley's history you could predict he would repeat past behavior, by continuing to run away, to steal, and to lie.

On cross-examination, Dr. Williams was asked about his own experience in discharging patients from Topeka State Hospital, and he said he had a rigorous process of analysis and tried to be thorough. He stated from review of Bradley's record he could not find indications of such thoroughness there. He also testified he always sent the patient back to the committing court, and let the court decide whether the patient should be discharged.

There is strong tension between the responsibilities placed upon a practitioner charged with making decisions to release or not to release mental patients and the interest of the patient not to be deprived of his or her liberty interest unnecessarily or unlawfully. It is for this reason the law does not require perfect performance, as the Court noted in Instruction No. 9. The evidence in this case, however, was sufficient for the jury to have concluded that the doctors who discharged Bradley Durflinger failed to exercise a reasonable degree of skill, knowledge and care to try to determine whether Bradley should be discharged.

There was ample evidence to find the doctors failed to act reasonably by conducting more testing and formulating a treatment plan. There was evidence from which the jury could conclude that rather than formulating a treatment plan, the Pinel team, and these professional defendants, Drs. Medrano and Rosales, followed the order of defendant Dr. Artiles to abandon the previously determined treatment plan, i.e., that Bradley would be sent to vocational rehabilitation in the Larned Hospital, or if he refused such treatment, be transferred to a state mental facility in Oregon. Instead, they followed a substitute course of releasing Bradley with no regard for the consequences.

The testimony of Drs. O'Connor and Williams indicated standards of care which the jury could conclude should have been followed, and there was ample evidence to conclude such standards were not met in this case.

In sum, the Court's total apprehension of this case from the evidence was that the evidence convincingly sustained the verdict. Additionally, other conclusions can be made which are appalling in their consequences to persons living in a free society, viz.:

1. That there must exist in society numerous dangerous mentally ill persons who are walking time bombs capable of inflicting grave injury without cause.

2. That the science of successful treatment of such persons when identified is illusory, based on human observation, and is virtually nonexistent.

3. That many mental hospitals are simply temporary restraining centers.

4. That curative treatment is lacking and final diagnosis of a mental state for discharge is based on standards of uncertainty, i.e., less than scientific certainty upon which such decisions should be based.

Of course, as pointed out previously in the body of this opinion, the other side of the coin, equally important, is the grave danger that overzealous medical and/or custodial personnel could hold an allegedly mentally ill person in custody on an indefi-

nite basis and infringe the right to liberty of such person, either when his demeanor and condition of health were misinterpreted to be dangerous, or when reticence to make such decision existed by the same inconclusive standard. Under such circumstances the traditional right of habeas corpus might be ineffective because of the inability of the restrained individual to reach the attention of a court.

It would appear that the solution of the social problem would require a high degree of professional care, again based on the reasonableness test. Additionally, liability could be avoided by an evidentiary hearing before a court to judicially determine mental status viz-a-viz dangerous propensity.

The foregoing remarks are, of course, obiter dicta and gratuitous, but do reflect concerns of the Court raised from conducting the trial of this case.

### DEFENDANTS' MOTION TO AMEND JUDGMENT

Also before the Court is defendants' motion to amend the judgment. This was a wrongful death action and recovery was limited to $100,000, plus funeral expenses, by the statute then in force. The jury returned a verdict of $92,300 at trial, which the Court reduced to $78,300, calculating that the $100,000 limit had been lowered to $75,000 by the $25,000 paid by Dr. Keeley in settlement before trial. Funeral expenses were $3,300. Defendants contend the correct calculation would be to reduce the $92,300 by subtracting the full settlement amount, leaving $67,300 in damages to be collected from the present defendants.

In *Jacobsen v. Woerner,* 149 Kan. 598, 89 P.2d 24 (1939), plaintiff had been injured when the bus she was riding was struck by an oil transport truck operated by defendant. She had received $250.00 from the bus line, and in return covenanted not to sue such bus line. At the trial, the jury found, in response to special questions, that there was no negligence on the part of the bus line. A second trial was held on the issue of damages against the truck driver, but the negligence holdings were not relitigat-

ed. The Kansas Supreme Court held that despite the non-liability of the bus line, the payment constituted partial satisfaction of the right of action for the accident. "Anything received on account of the injury inures to the benefit of all and operates as a payment *pro tanto.*" 149 Kan. at 603, 89 P.2d 24. See also, *Symons v. Mueller,* 526 F.2d 13, 19 (10th Cir.1975). This remained the law in Kansas at least until the advent of comparative negligence, which postdates this case. The Court finds defendants' motion to amend the judgment as to amount of damages has merit and should be sustained.

IT IS THEREFORE ORDERED that defendants' motion for a new trial is hereby denied.

IT IS FURTHER ORDERED that the defendants' motion to amend the judgment as to the amount of damages is sustained, and the damages awarded plaintiffs against defendants Artiles, Medrano and Rosales, is in the amount of $67,300, plus costs of this action.